# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 6, 2011 Session

## RUDOLPH POWERS v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. B-74909-11; P-09407      Lee V. Coffee, Judge**

---

**No. W2008-01346-SC-R11-PC - Filed June 16, 2011**

---

In separate trials, the petitioner was convicted of aggravated rape for an incident occurring in March of 1980 and of aggravated rape and robbery by use of a deadly weapon for an incident occurring in May of the same year. In 2007, the petitioner sought to have deoxyribonucleic acid ("DNA") analysis performed on the remaining evidence pursuant to the Post-Conviction DNA Analysis Act of 2001, arguing that exculpatory results would create a reasonable probability that he would not have been prosecuted or convicted on either charge. The petitioner contended that he could conclusively establish his innocence if the DNA profile developed from the evidence was uploaded into a DNA database and matched another profile in the system. The post-conviction court denied relief. The Court of Criminal Appeals affirmed, holding that DNA analysis was limited to a comparison between the petitioner's DNA and that collected as a part of the evidence in the case. We granted the petitioner's application for permission to appeal to determine (1) whether the General Assembly intended to permit petitioners proceeding under the Act to use DNA database matches to satisfy their burden and (2) whether the Court of Criminal Appeals' interpretation of the statute served to preclude the development of scientific evidence supportive of actual innocence. We hold that the Post-Conviction DNA Analysis Act permits access to a DNA database if a positive match between the crime scene DNA and a profile contained within the database would create a reasonable probability that a petitioner would not have been prosecuted or convicted if exculpatory results had been obtained or would have rendered a more favorable verdict or sentence if the results had been previously available. Because the criteria for ordering DNA analysis under the Act are established, the judgment of the Court of Criminal Appeals is reversed and the cause is remanded to the post-conviction court for entry of an order granting DNA analysis.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Case Remanded to Post-Conviction Court**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

William Dennis Massey, Michael Casey Shannon, Lorna S. McClusky, and Kemper B. Durand, Memphis, Tennessee, and Craig Cooley, New York, New York, for the appellant, Rudolph Powers.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; John H. Bledsoe, Senior Counsel; William L. Gibbons, District Attorney General; and John W. Campbell, Deputy District Attorney General, for the appellee, the State of Tennessee.

Larry Stewart and Patrick Wayne Norton, Nashville, Tennessee, for the amicus curiae, Dwight Adams, Kevin Curran, James Crow, and Jeffery E. Thoma.

David Louis Raybin, Nashville, Tennessee, for the amicus curiae, Ann Meng, Jennifer Thompson, Melinda Elkins, and Michele Mallin.

## OPINION
### Facts and Procedural History[1]

At approximately 4:30 p.m. on March 22, 1980, K.B. and D.W.,[2] both fourteen-year-old female students at Southside High School in Memphis, took a shortcut from the Southgate Shopping Center through an overgrown field near a railway. A man they met and later identified as the petitioner, Rudolph Powers, attempted to speak to them, and, when the girls tried to ignore him, placed a rusty kitchen knife to D.W.'s throat and demanded their money. When they answered that they had none, he ordered both to remove their clothes and, while instructing D.W. not to watch, vaginally raped K.B. Afterward, their assailant hesitated, appearing to be uncertain about what to do next. Eventually, he demanded addresses of the two girls and threatened to hurt them or members of their family if they reported the incident. He then walked toward the railroad tracks. Because of the threat, the two young women did not report the incident until the following night. An examination of

---

[1] Because the transcripts from the petitioner's two trials are not contained in the record on appeal, the facts and procedural history are taken from the portion of the Court of Criminal Appeals' opinion summarizing the trial testimony, see Powers v. State, No. W2008-01346-CCA-R3-PC, 2010 WL 571801, at *1-2 (Tenn. Crim. App. Feb. 18, 2010), the order by the post-conviction court denying the petition for DNA testing, and the filings of the parties.

[2] "It is this Court's policy not to identify by name minor children involved in rape cases. Instead, we will identify the victims by their initials." State v. Stokes, 24 S.W.3d 303, 304 n.1 (Tenn. 2000); see also State v. Marcum, 109 S.W.3d 300, 303 n.2 (Tenn. 2003).

K.B. at a rape crisis center, which included a blood sample, vaginal and saliva swabs, and a vaginal slide, revealed nonmotile sperm.[3] At the time, neither K.B. nor D.W. knew the identity of their assailant, but they did provide a description to the authorities, stating that he was a black male in his mid-thirties with a beard and mustache, 5' 5" tall, and about 140 pounds. Later, when the petitioner was arrested, each of the young women made a positive identification.

A second crime occurred on the afternoon of May 10, 1980, less than two months after the first, at the same location. V.B. and C.B., teenage female students at Carter High School,[4] left the Southgate Shopping Center and took the same shortcut through the overgrown field along the railway. A man they later identified as the petitioner approached them from behind and asked to accompany them. When they refused and quickened their pace, their assailant grabbed V.B., placed a knife with a broken point to her neck, and threatened to kill her if C.B. did not stay nearby. After learning that the two young women had no money, he forced them to remove their clothes and vaginally raped V.B. He directed C.B. to turn her back. As in the prior incident, the assailant appeared to be unsure as to what to do after the rape. Ultimately, he took items C.B. had purchased at the Center, ordered the women to wait twenty-five to thirty minutes before leaving, and ran down a path toward the railroad tracks.

Shortly thereafter, V.B. and C.B. reported the attack to the authorities. V.B. was examined at a rape crisis center. The evidence from the rape kit was sent to the University of Tennessee Toxicology Lab for testing. The women described their assailant as a twenty-six or twenty-seven-year old black male, 5' 6" tall, 155 to 160 pounds, with a dark complexion and a short afro. They recalled that he had a mustache but could not remember whether he also had a beard. He was wearing a black t-shirt with faded white lettering and black desert boots. Although the women testified at trial that the desert boots had red laces, their statements to police did not contain this information. C.B. noticed that the assailant wore a heart-shaped silver bracelet engraved with what appeared to be the name "Michael."

One week later, the petitioner was arrested for a robbery that took place near the shopping center. At the time, he was wearing a silver, heart-shaped bracelet bearing the name "Michelle." On the following day, the petitioner consented to a search of his

---

[3] The rape kit collected, apparently no longer in existence, was not a part of the record.

[4] Although previous opinions refer to V.B. and C.B. as attending Carter High School, it does not appear that a school with this name exists in the Memphis area. It is likely that the victims instead attended George Washington Carver High School, which is a Memphis City School. See G.W. Carver High School, http://www.mcsk12.net/schools/carver.hs/site/index.shtml (last visited Oct. 10, 2011).

apartment. Police found a pair of black desert boots with red shoelaces under his bed and a knife with a broken point under a chair cushion.

The petitioner was first tried for the rape of V.B. and the robbery of C.B., the latter of the two incidents. After determining that the crimes committed against the two young women qualified as "signature" crimes, the trial court allowed both K.B. and D.W., the victims of the earlier charges, to testify in order to establish identity.[5] Because the defense sought to establish that the line-up had been suggestive and that the girls were mistaken in their belief that the petitioner was their assailant, they were cross-examined at length about their identification of the petitioner. Teresa Paulette Sutton, a forensic serologist at the University of Tennessee Toxicology Lab, examined the evidence collected after the V.B. rape. She testified that spermatozoa were present on the slides, the vaginal swabs, and possibly on V.B.'s underwear. Tests performed on the swabs and underwear revealed the presence of acid phosphatase, which is indicative of seminal fluid. There was no DNA testing at the time.

The petitioner testified at his first trial, denying any involvement in the incident. He also presented alibi witnesses at trial in order to establish that he was at his mother's apartment and with his brother-in-law and niece during the period of time that V.B. was raped. A jury convicted the petitioner of aggravated rape, for which he received a life sentence, and robbery by use of a deadly weapon, for which he received a sentence of twenty-five years. These sentences were ordered to be served concurrently.

Later in 1982, the petitioner was tried for the rape of K.B. In addition to the identification testimony by K.B. and D.W., the trial court, because of the similarities between the two incidents, permitted both V.B. and C.B. to identify the petitioner as their assailant and to describe the nature of the assaults committed against them.[6] The petitioner did not

---

[5] While the petitioner challenged the propriety of this ruling on direct appeal, the Court of Criminal Appeals held that the testimony was properly admitted because the offenses qualified as "signature" crimes and could be used by the State to establish his identity. See State v. Powers, C.C.A. No. 6 at 6-7 (Tenn. Crim. App. Dec. 30, 1982), perm. app. denied (Tenn. Mar. 14, 1983). We make no assessment as to whether this ruling would be upheld under the evidentiary law as it has developed since the time of the petitioner's trial and direct appeal. See, e.g., Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[12][b] 4-102 (5th ed. 2005).

[6] While the petitioner challenged the admissibility of this testimony on direct appeal, the Court of Criminal Appeals held that it was properly admitted, as "[t]he similarities in the commissions of the crimes [were] sufficiently unusual to amount to a signature." See State v. Powers, C.C.A. No. 127 at 4 (Tenn. Crim. App. Oct. 13, 1983), perm. app. denied (Tenn. Mar. 5, 1984). Again, we do not assess whether this evidentiary ruling was correct under the law pertaining to signature crimes as it has developed since that
(continued...)

testify and did not offer alibi evidence, but vigorously attempted to discredit the identification testimony, pointing out that D.W. had told police that their assailant was named "Tuscon." A jury found the petitioner guilty of aggravated rape, and the trial court imposed a sentence of fifty years, which was to be served consecutively to the life sentence for his crimes involving V.B. and C.B.

After the petitioner's convictions were affirmed on direct appeal, he filed multiple petitions for post-conviction and habeas corpus relief, all of which were unsuccessful. See Powers v. State, No. M2009-00937-CCA-R3-HC, 2010 WL 27948 (Tenn. Crim. App. Jan. 6, 2010) (denying habeas corpus relief); Powers v. State, No. W2007-01245-CCA-R3-HC, 2008 WL 539033 (Tenn. Crim. App. Feb. 27, 2008) (denying habeas corpus relief); State v. Powers, No. W2001-00410-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 769 (Tenn. Crim. App. Sept. 10, 2001) (denying habeas corpus relief); State v. Powers, No. 02C01-9503-CR-00084, 1995 WL 695133 (Tenn. Crim. App. Nov. 22, 1995) (denying post-conviction relief); Powers v. Rone, C.C.A. No. 02-C-01-9208-CR-00191, 1993 WL 194008 (Tenn. Crim. App. June 9, 1993) (denying post-conviction relief); State v. Powers, C.C.A. No. 82, 1989 WL 105683 (Tenn. Crim. App. Sept. 13, 1989) (denying post-conviction relief).

On December 13, 2007, the petitioner filed a motion pursuant to the Post-Conviction DNA Analysis Act of 2001 ("the Act"), Tenn. Code Ann. §§ 40-30-301 to -313 (2006), seeking to have V.B.'s underwear subjected to DNA analysis.[7] The petitioner claimed that if the analysis produced exculpatory results, a reasonable probability existed that he would not have been prosecuted for or convicted of the offenses. He further argued that because the State's theory at trial was that the person who raped V.B. had also raped K.B., exculpatory DNA results from V.B.'s underwear would also have made it reasonably likely that he would not have been prosecuted for or convicted of the aggravated rape of K.B.[8] While pointing out that the nurse's report from V.B.'s examination indicated that she had engaged in consensual intercourse less than twelve hours before the rape, the petitioner contended that even if two DNA profiles were found on the underwear, confidence in his

_____

[6](...continued)
time. See, e.g., Cohen et al., supra note 4.

[7] The petitioner planned to subject the biological material to short tandem repeat ("STR") DNA testing, which requires only a small sample and can produce accurate results from degraded samples. See John M. Butler, Forensic DNA Typing: Biology, Technology, and Genetics of STR Markers 146 (2d ed. 2005) [hereinafter Butler, Forensic DNA Typing].

[8] The petition also requested that the State be compelled to determine the whereabouts of additional evidence related to both offenses – the rape kit samples collected from V.B. and K.B., as well as the skirt V.B. wore at the time of the rape.

convictions would be undermined if neither one matched his DNA profile. He also asserted that if only one profile was developed, it could be uploaded into a DNA database in an effort to identify the actual perpetrator. Further, if the profile matched that of a previous offender already uploaded into the database, this would conclusively establish his innocence.

In response, the State argued that because the petitioner had been positively identified by all four of the young women and other corroborative evidence connected him to the crimes, he would still have been prosecuted despite the existence of favorable DNA testing results. The State, relying on the Court of Criminal Appeals' previous interpretation of the Act in cases such as Alley v. State, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *8-9 (Tenn. Crim. App. June 22, 2006) ("Alley II"), further argued that the Act only authorizes the comparison of "the petitioner's DNA to samples taken from biological specimens gathered at the time of the offense," and does not "open the door to any other comparisons the petitioner may envision."

Following a hearing, the post-conviction court denied relief, holding that the petitioner had failed to demonstrate that a reasonable probability existed that he would not have been prosecuted or convicted if exculpatory results were obtained through DNA analysis. See Tenn. Code Ann. § 40-30-304(1) (requiring that "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis"). The trial court commented that "[e]ven if DNA results were found to belong to an unknown or a third party, those results would not prove exculpatory" because the other evidence implicating the petitioner, such as the eyewitness identifications and the incriminating items found during the search of his apartment, "render[ed] it virtually impossible for any . . . person other than the [petitioner] to have committed these violent crimes."[9] In response to the petitioner's argument that "exculpatory results can include the presence of third party DNA and/or the absence of his DNA," the post-conviction court observed that the Court of Criminal Appeals had previously interpreted the Act such that DNA analysis could not be used "to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant." (Internal quotation marks omitted).

The Court of Criminal Appeals affirmed, ruling that even if the petitioner received

_____

[9] The post-conviction court also determined that, with regard to the K.B./D.W. charges, no evidence subject to testing existed and, therefore, that the petitioner failed to satisfy his burden under the second prong of the Act. See Tenn. Code Ann. §§ 40-30-304(2) & -305(2) (mandating that the evidence sought for testing "is still in existence and in such a condition that DNA analysis may be conducted"). The post-conviction court also surmised that, as to V.B.'s underwear, it was unclear whether "any meaningful test could be done" based on the age and condition of the evidence and that the petitioner had "failed to present any scientific testimony or proof that such testing could be accomplished."

favorable results after testing V.B.'s underwear, there was "no reasonable probability that the [p]etitioner would not have been prosecuted or convicted in light of the overwhelming evidence of his guilt presented at trial." Powers, 2010 WL 571801, at *9.[10]  The Court of Criminal Appeals observed that the petitioner's claim that he should be exonerated if two DNA profiles did not match his was based on the "presumption that [V.B.] engaged in consensual sexual activity with only one individual prior to the offense," and agreed with the State's contention that "no evidence in th[e] record supports this presumption." Id. at *10. The court also rejected the petitioner's argument that the Act permitted uploading the DNA evidence to a database in order to determine if there was a match with another offender, following the holding in Alley II, which "'reject[ed] . . . the need to 'run' DNA testing results through a DNA database'" because "'[t]he results of DNA testing must stand alone and do not encompass a speculative nationwide search for the possibility of a third party perpetrator.'" Powers, 2010 WL 571801, at *10-11 (quoting Alley II, 2006 WL 1703820, at *9).

This Court granted the petitioner's Rule 11 application for permission to appeal, which presents two issues: (1) whether the General Assembly intended to prevent petitioners from relying on DNA database hits in order to satisfy their burden under the Act; and (2) whether the Court of Criminal Appeals' interpretation of the Act arbitrarily abrogates a petitioner's state-created liberty interest in developing scientific evidence of his or her actual innocence.

## Standard of Review

This case requires us to interpret the Post-Conviction DNA Analysis Act of 2001. Matters involving statutory construction are issues of law that are reviewed de novo on appeal with no presumption of correctness. Estate of French v. Stratford House, 333 S.W.3d 546, 554 (Tenn. 2011).  "When called upon to construe a statute, we must first ascertain and then give full effect to the General Assembly's intent and purpose." Waters v. Farr, 291 S.W.3d 873, 881 (Tenn. 2009) (citing Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008)).  This Court's "chief concern is to carry out the legislature's intent without either broadening or restricting the statute beyond its intended scope." Waters, 291 S.W.3d at 881.  We presume that each word in the statute has "'meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature.'" Id. (quoting In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005)).  If the statute is clear and unambiguous, "we apply its plain meaning without complicating the task." Id. If, however, the statute is ambiguous, "we may refer to the broader statutory scheme, the

_____

[10] The Court of Criminal Appeals also agreed with the post-conviction court's determination that the petitioner had failed to present evidence that V.B.'s underwear could successfully be subjected to DNA testing. Id.

history of the legislation, or other sources to discern its meaning." State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009). When construing statutes, we presume that the General Assembly was aware of its prior enactments and knew "the state of the law at the time it passe[d the] legislation." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).

## Background

Deoxyribonucleic acid, or "DNA," is the group of molecules in which an organism's genetic information is stored. David E. Newton, DNA Evidence and Forensic Science 39 (Infobase Publ'g 2008) [hereinafter Newton, DNA Evidence]; see also Butler, Forensic DNA Typing 17 (describing DNA as humans' "genetic blueprint"). DNA can be obtained from blood, hair, skin, or even a single human cell from any part of the body. Newton, DNA Evidence at 41. Although all humans' DNA is 99.5% identical, the remaining 0.5% differs from individual to individual. See David H. Kaye, The Double Helix and the Law of Evidence 42-43 (2010) [hereinafter Kaye, Double Helix].[11] Alec Jeffreys, an English geneticist, was the first person to utilize these differences, known as variable number of tandem repeats, or "VNTRs," to develop what we now refer to as DNA "fingerprinting," or "profiling." Butler, Forensic DNA Typing at 2-3. Jeffreys' original method was called restriction fragment length polymorphisms ("RFLP") because it used "a restriction enzyme to cut the region of DNA surrounding the VNTRs." Id. at 3. RFLP, which is only useful when substantial quantities of biological material are available for testing, was largely replaced by a method called polymerase chain reaction ("PCR"), which requires only a small sample. Brandon L. Garrett, Claiming Innocence, 92 Minn. L. Rev. 1629, 1658-59 (2008) [hereinafter Garrett, 92 Minn. L. Rev.]. More recently, short tandem repeat ("STR") testing has been developed, which "permit[s the] . . . examination of short fragments of DNA that are more likely to be preserved," as well as mitochondrial DNA testing[11] and Y-STR testing.[12] Id. at 1659. While not absolutely conclusive, DNA testing makes it possible "to

---

[11] "The DNA alphabet is composed of only four characters representing the four nucleobases: A (adenine), T (thymine), C (cytosine), and G (guanine)." Butler, Forensic DNA Typing at 18. The combination of these bases "yield[s] the diverse biological differences among human beings and all living creatures." Id. at 19.

[11] Mitochondrial DNA, or "mtDNA," is more stable than nuclear DNA (which is the DNA used in other types of analyses) and therefore "is the genetic system of choice in cases where tissue samples are very old, very small, or badly degraded by heat and humidity." Kaye, Double Helix at 214. It is also useful when hair is found at the scene of a crime. Id. at 227. While STR analysis can be performed on the "living part of the hair cell," or the "bulb at the bottom of the follicle," in order to do so, the hair must be "torn from the scalp." Id. at 227-28. However, mtDNA analysis can be performed on "dead hair shafts [that] are simply shed." Id. at 228.

[12] Y-STR testing permits DNA analysis on the Y chromosome. Garrett, 92 Minn. L. Rev. at 1659. Since the Y chromosome is inherited paternally, "[a]ll men in the same paternal lineage should have the
(continued...)

-8-

calculate the likelihood that any two persons will have exactly the same . . . DNA 'fingerprint.'" Newton, DNA Evidence at 40. For instance, "it is generally not difficult to say that the chance of finding a given DNA pattern in two different individuals is one in 10 million or one in 100 million, one in a billion, or some similar[ly] . . . low frequency." Id. at 41. Because of its probative value, "DNA typing has now replaced digital fingerprinting as the 'gold standard' of individualization in forensic science." Id.

Every state has implemented legislation requiring individuals convicted of certain crimes to submit DNA samples and providing for the storage of DNA profiles developed from such samples in DNA databases,[13] Newton, DNA Evidence at 50, and as long as the DNA profiles have been developed pursuant to federal guidelines, see generally 42 U.S.C.A. § 14135 (West 2005 & Supp. 2010), state and local governments may avail themselves of the Combined DNA Index System ("CODIS"). Garrett, 92 Minn. L. Rev. at 1653-54. CODIS, which is a computer software program, is a three-tiered system that allows DNA-related information to be shared between local agencies, or local DNA index systems ("LDIS"), state agencies, or state DNA index systems ("SDIS") and the FBI, or the National DNA Index System ("NDIS"). Newton, DNA Evidence at 47; see also LDIS, SDIS, and NDIS, DNA Initiative, http://www.dna.gov/solving-crimes/cold-cases/howdatabasesaid/codis/ (last visited June 6, 2011). CODIS contains two indexes: a convicted offender index, which contains the DNA profiles of persons convicted of particular crimes, and the forensic index, which contains DNA profiles obtained from crime scene evidence. Basics of How CODIS Works, DNA Initiative, http://www.dna.gov/dna-databases/codis (last visited June 14, 2011).[14] CODIS "'allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system.'" Banks v. United States, 490 F.3d 1178, 1181 (10th Cir. 2007) (quoting H.R. Rep. No. 106-900(I), at 8 (2000), reprinted in 2000 U.S.C.C.A.N. 2323, 2324).

---

[12](...continued)
same" Y chromosome STRs, or "Y-STRs." Kaye, Double Helix at 209. Particularly in rape cases, because the presence of a Y-STR "will pertain to men only" and "[b]ecause each man has only one Y-STR allele per locus[,] . . . the number of Y-STRs at the various loci should indicate the number of male contributors to the sample . . . ." Id. at 211. "Furthermore, a match between a defendant and the Y-STRs in a sexual-assault sample is additional evidence in and of itself that the defendant is a contributor." Id.

[13] A DNA databank, or database, "is simply a library of DNA samples taken from individuals and crime scenes and stored in [a] central location," which "is used to compare DNA samples collected at the scene of a crime or taken from people arrested for crimes with samples from known felons," as well as to solve "so-called cold cases." Newton, DNA Evidence at 47.

[14] The profiles in CODIS are developed largely through STR and mitochondrial DNA analyses. See What is CODIS?, DNA Initiative, http://www.dna.gov/solving-crimes/cold-cases/howdatabasesaid/codis/ (last visited June 10, 2011); see also Butler, Forensic DNA Typing at 94-95.

While known for its crime-solving capabilities, "from its earliest days, DNA typing has also served a second function of equal importance: the determination of a person's innocence." Newton, DNA Evidence at 49. DNA analysis was first used in a forensic setting in 1986 in an attempt to solve two rape-murders in England. Butler, Forensic DNA Typing at 3. Although a man confessed to one of the murders, DNA analysis revealed that the man's profile did not match the semen collected from either crime scene and he was eliminated as a suspect. Id.[15] DNA analysis was used three years later in the United States to exonerate Gary Dotson, a man who had served ten years in an Illinois prison for a crime that he did not commit. Brandon L. Garrett, Judging Innocence, 108 Colum. L. Rev. 55, 63 (2008). Because of "the lack of available remedies in the state or federal courts" when a convicted defendant sought post-conviction access to DNA analysis, the states began to enact legislation affording a right to such testing. Garrett, 92 Minn. L. Rev. at 1673. Illinois and New York were the first, passing such legislation in 1999. Id. Today, forty-eight states[16] and

_____

[15] DNA testing later allowed the authorities to identify the actual perpetrator of the rape-murders. See Butler, Forensic DNA Typing at 3.

[16] Ala. Code § 15-18-200 (West, Westlaw through End of 2010 1st Special Sess.); Alaska Stat. Ann. §§ 12.73.010 to -.090 (West, Westlaw through 2010 2d Reg. Sess. of the 26th Leg.); Ariz. Rev. Stat. Ann. § 13-4240 (West, Westlaw through 1st Special Sess. & legis. effective Apr. 28, 2011 of the 1st Reg. Sess. of the 50th Leg.); Ark. Code Ann. § 16-112-201 (West, Westlaw through end of 2010 Fiscal Sess., including changes made by Ark. Code Rev. Comm. received through 12/31/10 & emerg. eff. acts from 2011 Reg. Sess.); Cal. Penal Code § 1405 (West, Westlaw current with urgency legis. through Ch. 25 of 2011 Reg. Sess. & Ch. 20 of 2011-2012 1st Ex. Sess.); Colo. Rev. Stat. Ann. §§ 18-1-411 to -416 (West, Westlaw through laws effective May 5, 2011); Conn. Gen. Stat. Ann. § 54-102kk (West, Westlaw through Gen. St., Rev. 1-1-2011); Del. Code Ann. tit. 11, § 4504 (West, Westlaw through 78 Laws 2011, chs. 1-12); D.C. Code § 22-4133 (West, Westlaw through Mar. 7, 2011); Fla. Stat. Ann. §§ 925.11 to -.12 (West, Westlaw through chs. in effect from the 2011 1st Reg. Sess. of the 22d Leg. through Apr. 27, 2011); Ga. Code Ann. § 5-5-41 (West, Westlaw through 2010 Reg. Sess.); Haw. Rev. Stat. §§ 844D-121 to -133 (West, Westlaw current with amendments through Act 8 of the 2011 Reg. Sess.); Idaho Code Ann. § 19-4902 (West, Westlaw through (2011) Chs. 1-334 that are eff. on or before Apr. 19, 2011); 725 Ill. Comp. Stat. Ann. 5/116-3 (West, Westlaw through P.A. 97-1 of the 2011 Reg. Sess.); Ind. Code Ann. §§ 35-38-7-1 to -19 (West, Westlaw through 2011 Public Laws approved & eff. through 6/28/2011); Iowa Code Ann. § 81.10 (West, Westlaw through immediately eff. legis. signed as of 5/19/2011 from the 2011 Reg. Sess.); Kan. Stat. Ann. § 21-2512 (West, Westlaw through 2010 reg. sess.); Ky. Rev. Stat. Ann. §§ 422.285 & -.287 (West, Westlaw through end of 2010 Legis.); La. Code Crim. Proc. Ann. art. 926.1 (West, Westlaw through 2010 Reg. Sess.); Me. Rev. Stat. Ann. tit. 15, §§ 2136-38 (West, Westlaw current with emergency legis. through Ch. 72 of the 2011 1st Reg. Sess. of the 125th Leg.); Md. Code Ann. Crim. Proc. § 8-201 (West, Westlaw through all chs. of the 2011 Reg. Sess. of the Gen. Assembly through June 6, 2011); Mich. Comp. Laws Ann. § 770.16 (West, Westlaw through P.A. 2011, No. 29, of the 2011 Reg. Sess., 96th Leg.); Minn. Stat. Ann. § 590.01 (West, Westlaw current with laws of the 2011 Reg. Sess. through Ch. 10); Miss. Code Ann. § 99-39-5 (West, Westlaw through 2010 Reg. & 1st & 2d Extraordinary Sess.); Mo. Rev. Stat. 547.035 (West, Westlaw current with emergency legis. approved through Apr. 27, 2011 of the 1st Reg. Sess. of the 96th Gen. Assembly);

(continued...)

-10-

the federal government[17] have enacted statutes or rules providing for post-conviction access to DNA analysis. Since Gary Dotson's exoneration in 1989, over 250 people have been exonerated through post-conviction DNA analysis. See Frequently Asked Questions, The Innocence Project, http://www.innocenceproject.org/Content/How_many_people_have_been_exonerated_through_DNA_testing.php (last visited June 2, 2011). Of the first two hundred exonerations, almost one-fourth occurred because the DNA evidence taken from the crime scene matched the profile of a perpetrator that was already uploaded in a DNA database. Garrett, 92 Minn. L. Rev. at 1659.

## Analysis
### I. "DNA Analysis" Under the Act
### A. Statutory Text

The Act provides that a person convicted of certain enumerated offenses, including aggravated rape,

---

[16](...continued)
Mont. Code Ann. § 46-21-110 (West, Westlaw through all 2009 legis. & 2010 ballot measures); Neb. Rev. Stat. §§ 29-4116 to -4125 (West, Westlaw through 101st Leg. 2d Reg. Sess. 2010); Nev. Rev. Stat. Ann. § 176.0918 (West, Westlaw through 2009 75th Reg. Sess. & 2010 26th Special Sess.); N.H. Rev. Stat. Ann. §§ 651-D:1 to -D:5 (West, Westlaw through Ch. 60 of the 2011 Reg. Sess.); N.J. Stat. Ann. § 2A:84A-32a (West, Westlaw through L.2011, c. 67 & J.R. No. 5); N.M. Stat. Ann. § 31-1A-2 (West, Westlaw through all 2010 legis.); N.Y. Crim. Proc. Law § 440.30 (West, Westlaw through L.2011, chs. 1-18 & 50-54); N.C. Gen. Stat. § 15A-269 (West, Westlaw through Ch. 18); N.D. Cent. Code Ann. § 29-32.1-15 (West, Westlaw through 2009 Reg. Sess.); Ohio Rev. Code Ann. §§ 2953.71 to -.83 (West, Westlaw through 2011 Files 1-8, 10-18 of the 129th GA (2011-2012)); Or. Rev. Stat. Ann. §§ 138.690 to -.840 (West, Westlaw through Ch. 25 of the 2011 Reg. Sess.); 42 Pa. Cons. Stat. Ann. § 9543.1 (West, Westlaw through Act 2011-3); R.I. Gen. Laws Ann. § 10-9.1-11(c) (West, Westlaw through ch. 320 of the Jan. 2010 sess.); S.C. Code Ann. §§ 17-28-10 to -120 (West, Westlaw through End of 2010 Reg. Sess.); S.D. Codified Laws §§ 23-5B-1 to -17 (West, Westlaw through the 2010 Reg. Sess.); Tenn. Code Ann. §§ 40-30-301 to -313; Tex. Code Crim. Proc. Ann. art. 64.01 to -.05 (West, Westlaw through Ch. 41 of the 2011 Reg. Sess. of the 82d Leg.); Utah Code Ann. §§ 78B-9-300 to -304 (West, Westlaw through 2010 Gen. Sess.); Vt. Stat. Ann. tit. 13, §§ 5561-5570 (West, Westlaw through No. 7 of the 2011-2012 sess. (2011) of the Vt. Gen. Assembly); Va. Code Ann. § 19.2-327.1 (West, Westlaw through End of 2010 Reg. Sess.); Wash. Rev. Code Ann. § 10.73.170 (West, Westlaw current with 2011 legis. eff. through May 12, 2011); W. Va. Code Ann. § 15-2B-14 (West, Westlaw through S.B. 215 of 2011 Reg. Sess.); Wis. Stat. Ann. § 974.07 (West, Westlaw through 2011 Act 9 & 2011 Acts 11-15); Wyo. Stat. Ann. § 7-12-303 (West, Westlaw through 2010 Budget Sess.). Massachusetts and Oklahoma are the only states that do not have specific laws providing for post-conviction DNA analysis. See Joseph Lazazzero, Note, Justice Undeterred: A Call for Massachusetts Legislation on Post-Conviction DNA Access, 44 Suffolk U. L. Rev. 231, 232-33 (2011).

[17] See 18 U.S.C.A. § 3600 (West Supp. 2010).

may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303. In consequence, there is no statutory time limit on requests for testing and "the right to DNA analysis under the Act may not be waived by implication." Griffin v. State, 182 S.W.3d 795, 799 (Tenn. 2006).

Tennessee Code Annotated section 40-30-304 is mandatory, providing that once the prosecution has been notified and given the opportunity to respond,

the court shall order DNA analysis if it finds that:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

(Emphasis added).

The Act also contains a discretionary provision, directing that, after the prosecution has been notified and given the opportunity to respond, the post-conviction court

may order DNA analysis if it finds that:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to

-12-

the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-305 (emphasis added). Under either the mandatory or discretionary provision, all four elements must be met before DNA analysis will be ordered by the court. See Alley v. State, No. 2004-01204-CCA-R3-PD, 2004 WL 1196095, at *2 (Tenn. Crim. App. May 26, 2004) ("Alley I"); Buford v. State, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003). Tennessee Code Annotated section 40-30-310 provides that, when DNA testing is warranted, a court "shall select a laboratory that meets the standards adopted pursuant to the DNA Identification Act of 1994, 42 U.S.C. § 14131 et seq.," a federal statutory provision that, among other things, provides for the development and issuance of standards for "testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA." 42 U.S.C.A. § 14131(a)(1)(C) (West 2005).[18] The Act also allows a post-conviction court, "in its discretion, [to] make such other orders as may be appropriate." Tenn. Code Ann. § 40-30-311.

The pertinent provision for purposes of this appeal, however, is section 40-30-302, which defines "DNA analysis" as "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes." Our Court of Criminal Appeals has held that this language "limits [the statute's] reach to permit only the performance of a DNA analysis which compares the petitioner's DNA samples to DNA samples taken from biological specimens gathered at the time of the offense if all four statutory criteria are met." Crawford v. State, E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App. Aug. 4,

---

[18] These provisions also authorize the Director of the Federal Bureau of Investigation to establish an index of DNA identification records, see 42 U.S.C.A. § 14132(a) (West 2005 & Supp. 2010), allow the Attorney General to provide eligible state and local governments with funds to carry out DNA analyses for inclusion in CODIS, see 42 U.S.C.A. 14135(a)(1)-(5) (West 2005 & Supp. 2010), and govern the collection and use of DNA identification information from certain federal and District of Columbia offenders. See 42 U.S.C.A. §§ 14135a & b (West 2005 & Supp. 2010).

2003); see also Alley II, 2006 WL 1703820, at *9 ("The statute does not authorize the trial court to order the victim to submit new DNA samples years after the offense, nor does the statute open the door to any other comparisons the petitioner may envision."). We must determine whether this interpretation is in accordance with the legislature's intent and purpose.

The petitioner argues that the interpretation in Crawford, which forecloses any demonstration of the guilt of a third-party offender through a database hit, conflicts with the "plain text and legislative history" of the Act. He asserts that the purposes of the Act are not only to identify the wrongly accused, but also to find the actual perpetrators of crimes, and that the "most effective – if not the only – way to conclusively prove another person's guilt through DNA evidence is to afford the prisoner a limited procedural right to access a DNA database."

Unlike the Court of Criminal Appeals, we do not read section 40-30-302 to so "clearly limi[t] [the] reach" of the Act. Crawford, 2003 WL 21782328, at *3. The key terms, which mandate a comparison between the DNA contained in "a human biological specimen" with "another biological specimen," are general in nature. The only limitation relating to the evidence sought for testing is that it must be "in the possession or control of the prosecution, law enforcement, laboratory, or court" and must be "related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." Tenn. Code Ann. § 40-30-303. There is nothing in these provisions limiting the DNA analysis to the extent set out in Crawford, particularly when they are read in conjunction with the General Assembly's broad grant of discretionary authority to "make such other orders as may be appropriate." Tenn. Code Ann. § 40-30-311. If the comparison between a DNA profile developed from crime scene evidence and a petitioner's DNA profile does not return a match, and uploading the crime scene DNA profile into a database has the potential to establish a petitioner's innocence and identify the true perpetrator of the crime, then the trial court may issue an order providing for such a comparison. This would not run afoul of section 40-30-302. DNA databases contain DNA profiles developed from "biological specimen[s]" taken from both crime scenes and criminal defendants. When a DNA profile is entered into a database, a comparison occurs between the DNA profile derived from that "biological specimen" and those profiles already in the database, albeit at a rapid pace. The broad language employed by the General Assembly authorizes a comparison between the DNA profile developed from crime scene evidence that does not match the petitioner's profile, which is "DNA in a human biological specimen," with "DNA from another biological specimen." Our interpretation is that this includes a comparison with other profiles contained in the database.

### B. Legislative History

-14-

Although we determine that the Act contemplates the type of DNA analysis sought by the petitioner, "[w]here, as here, the parties derive different interpretations from the statutory language, an ambiguity exists," Owens, 908 S.W.2d at 926,[19] and it is proper to look beyond the text to determine the statute's meaning. State v. Sherman, 266 S.W.3d 395, 401 (Tenn. 2008). When the statutory language is ambiguous, the legislative history often offers guidance in discerning the General Assembly's purpose and intent. See Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008). House Bill 770 was introduced in the House Judiciary Committee on April 18, 2001. During the committee hearing, the bill's sponsor, Representative Briley, asked that attorney Ken Irvine, who at the time served as the president of the Tennessee Innocence Project, be allowed to testify.[20] Irvine described what the bill was designed to do and pointed to the increased prominence of DNA exonerations:[21]

> I think it's . . . important . . . to the person [who] is serving the time [who has] been innocent all along . . . but it's also important to all the citizens of our state because . . . someone's in [prison who] hasn't committed the crime [and] the person that committed it may still be out there . . . we need that person off the streets, we need the right person in prison, not the wrong one, so it's important to all of us.

Hearing on H.B. 770 Before the H. Judiciary Comm., 2001 Leg., 102d Sess. (Tenn. 2001) (statement of Ken Irvine, President, Tennessee Innocence Project). The bill passed out of the Judiciary Committee and was referred to the House Finance Budget Subcommittee.

On May 15, 2001, Senate Bill 796 was introduced in the Senate Judiciary Committee. Senator Cohen,[22] the bill's sponsor, provided the committee members with two news articles profiling criminal defendants who had recently been declared innocent as a result of

---

[19] This proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. Here, because we determine that the interpretations of the Act articulated by the petitioner and the State are both reasonable, an ambiguity exists.

[20] Irvine later served as a Criminal Court Judge in Knox County.

[21] At that time, around 80 people had been exonerated by DNA evidence throughout the United States. Hearing on H.B. 770 Before the H. Judiciary Comm., 2001 Leg., 102d Sess. (Tenn. 2001) (statement of Ken Irvine, President, Tennessee Innocence Project). As previously noted, that number has increased to over 250. See Frequently Asked Questions, The Innocence Project, http://www.innocenceproject.org/Content/ How_many_people_have_been_exonerated_through_DNA_testing.php (last visited June 2, 2011).

[22] Steve Cohen, a former state senator, now serves as United States Representative for the 9th District in Tennessee.

exculpatory DNA evidence. He observed that, in those cases, the true perpetrators of the crimes "had been free for all these years" because DNA testing had not been previously performed to show that "they had the wrong person." Hearing on S.B. 796 Before the S. Judiciary Comm., 2001 Leg., 102d Sess. (Tenn. 2001) (statement of Sen. Steve Cohen). Senator Cohen went on to state that imprisoning an innocent person was "the worst thing the State could ever do," not only because it resulted in the wrongful deprivation of a person's liberty, but also because it would result in "letting a criminal out there prey on others." Id. He expressed his belief that "this is one of the most important bills . . . we can [pass] in this General Assembly because you're talking about freedom, you're talking about apprehending the right person, and not incarcerating somebody wrongly." Id. The bill was passed unanimously out of the Judiciary Committee.

On May 31, 2001, the Senate bill was heard in the Senate Finance, Ways and Means Committee. While this committee's focus was upon the potential costs of DNA analysis and how the measure would be funded, Senator Cohen made the following statement in support of the legislation:

> If it frees people [who] are unlawfully and improperly jailed, it's the best thing we can do, because these people are having their liberty taken from them unlawfully and unjustly, and then we can also go out and find the right person because there's a guilty person out in society, so it's a law-enforcement measure as well as a liberty and justice measure . . . . that will help both the victims, and the innocent, and justice in general.

Hearing on S.B. 796 Before the S. Fin., Ways & Means Comm., 2001 Leg., 102d Sess. (Tenn. 2001) (statement of Sen. Steve Cohen). When the bill first went before the full Senate for a vote, Senator Cohen again emphasized that the bill not only allowed those who are wrongfully convicted to prove their innocence, but also would also help identify the real perpetrator of the crime, which was particularly important where recidivist crimes, such as rape and sexual offenses, were involved, as the true perpetrator would likely commit additional crimes if not apprehended. See S. Sess. June 7, 2001 (statement of Sen. Steve Cohen).[23]

This legislative history indicates that the bill's sponsors viewed the Act as serving two purposes: first, to aid in the exoneration of those who are wrongfully convicted and second, to aid in identifying the true perpetrators of the crimes. DNA analysis that only compares a

---

[23] The bill ultimately passed the House and the Senate by large majorities. See H. Sess. July 11, 2001; see also S. Journal, 102d Gen. Assembly, Organizational & First Reg. Sess. 1669-70 (2001). The bill was signed into law by Governor Don Sundquist on July 18, 2001 and took effect on August 1, 2001. See Post-Conviction DNA Analysis Act of 2001, ch. 444, §§ 1-3, 2001 Tenn. Pub. Acts 1135, 1135-38.

petitioner's profile with a profile developed from biological material found at a crime scene cannot effectuate this second purpose. When, however, uploading the latter into a DNA database can potentially identify the person responsible for the crime, the Act also serves a "law-enforcement," or justice-finding, purpose: the apprehension of criminals who may still be at large.

### C. Related Statutory Provisions

We must also construe the Act in light of two other statutes dealing with the subject of DNA evidence, Tennessee Code Annotated sections 38-6-113 (2010) and 40-35-321 (2010). See Owens, 908 S.W.2d at 926 ("Statutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together."). Section 38-6-113 establishes the Tennessee Bureau of Investigation's DNA database, while section 40-35-321(b) mandates that persons convicted of certain enumerated offenses must provide a biological specimen "for the purpose of DNA analysis" and that the specimen "shall be forwarded by the approved agency or entity collecting the specimen to the Tennessee bureau of investigation, which shall maintain it as provided in § 38-6-113." See also Tenn. Code Ann. § 40-35-321(c)–(e). Sections 38-6-113 and 40-35-321, which were passed in 1991, see Act of May 29, 1991, ch. 480, §§ 1-2, 1991 Tenn. Pub. Acts 815, 815-16, define "DNA analysis" in the exact same manner as the Act. See Tenn. Code Ann. § 38-6-113(a) (defining "DNA analysis" as "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes"); Tenn. Code Ann. § 40-35-321(a) (same). A court interpreting a statute must "presume that a legislative body was aware of its prior enactments and knew the state of the law at the time it passed the legislation." Leggett v. Duke Energy Corp., 308 S.W.3d 843, 852 (Tenn. 2010). Because the Act was passed in 2001, we must presume that the Legislature's use of the same definition for "DNA analysis" as that contained in the statutes creating Tennessee's DNA database means that "DNA analysis" under the Act contemplates the use of a DNA database.

In State v. Scarborough, 201 S.W.3d 607, 615-18, 622 (Tenn. 2006), this Court analyzed the purpose of these statutory provisions in the context of determining whether extracting blood from a felon for DNA analysis pursuant to section 40-35-321 violated the Fourth Amendment and article I, section 7 of the Tennessee Constitution. While holding that the collection and analysis of the defendant's blood was a reasonable search under both the federal and state constitutions, this Court addressed the competing interests involved, including the importance of the governmental interest sought to be furthered by the statutes, and made particular note of the government's "obvious" interest in "correctly identifying those who have broken its laws," observing that "'[t]he individuality of . . . DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct.'" Scarborough, 201 S.W.3d at 620-21 (quoting Jones v. Murray, 962 F.2d 302, 307 (4th Cir.

1992)). Additionally, this Court recognized the government's interest in increasing the accuracy of criminal investigations and prosecutions and noted that DNA databases would help to solve future crimes, but "'[e]qually important, the DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit.'" Id. at 621 (quoting United States v. Sczubelek, 402 F.3d 175, 185 (3d Cir. 2005)). Based upon these factors, the opinion in Scarborough concluded that, by enacting the statutes mandating the collection and storage of DNA evidence, "our legislature has put into place a method of more accurately identifying those who commit and are convicted of felonies, thereby enabling law enforcement personnel to more quickly and accurately exonerate the innocent and prosecute the perpetrators." Id.

The purposes of sections 38-6-113 and 40-35-321 are twofold. Their primary purpose is the identification of those who commit crimes. Their secondary purpose, however, is to exonerate those who have not committed crimes. Construing the Act to allow a petitioner to access a DNA database in order to analyze a DNA profile developed from biological material found at a crime scene that does not match his or her own profile clearly effectuates both these purposes – a positive "hit" would not only cast considerable doubt on a petitioner's guilt of the crime for which he or she was convicted, but also could potentially identify the true perpetrator and subsequently prove a petitioner's innocence.[24]

In Banks, the Court of Appeals for the Tenth Circuit addressed a constitutional challenge to the federal statute requiring certain offenders to submit a DNA sample for inclusion in the national DNA database. 490 F.3d at 1180. As in Scarborough, the Banks court, while addressing the reasonableness of the search, noted the government's interest in collecting offenders' DNA profiles so that it could solve crimes, observing that

> a DNA database . . . help[s] exonerate innocent defendants and convicts. While a criminal defendant may submit his or her own DNA sample for comparison with the sample discovered at a crime scene, a negative result would not necessarily exculpate the defendant. If other evidence ties the defendant to a crime, even though the defendant is innocent, the government would be free to argue that two perpetrators committed the crime. The government could easily explain the evidence: the DNA came from the defendant's accomplice and the other evidence points to the defendant's participation. Because the negative DNA test does not eliminate this possibility, and because the other

---

[24] As one commentator recently noted, "[a]ny unknown DNA profile detected in a case can now be entered into the national databank system, and any resulting 'cold hits' often solve cases"; further, in "110 of the first 250 DNA exonerations, postconviction DNA testing also inculpated the perpetrator, most often due to a cold hit." Brandon L. Garrett, DNA and Due Process, 78 Fordham L. Rev. 2919, 2931 (2010).

evidence will tie the defendant to the crime, a jury might convict the defendant despite his actual innocence and a negative DNA-test result.

With a comprehensive database like CODIS, however, the DNA discovered from the crime scene might match with a previously unsuspected individual, whom the innocent defendant might be able to show acted alone. The defendant will at least have a better opportunity to create reasonable doubt about whether the government indicted the guilty person.

Id. at 1188-89.  The Banks decision lends credence to an interpretation of the Act, as well as sections 38-6-113 and 40-35-321, such that they serve to effectuate the dual purposes of exonerating those who have been wrongfully convicted and identifying the real perpetrators of the crimes.

Based upon the foregoing authority, we hold that the General Assembly intended to allow petitioners proceeding under the Act to access a DNA database if a positive match between the crime scene DNA profile and a profile contained within the database would create a reasonable probability that the petitioner would not have been prosecuted or convicted if the exculpatory results had been previously available or that DNA analysis would have rendered the petitioner's verdict or sentence more favorable.  Because we have concluded that the Act contemplates the use of DNA databases to establish third-party guilt based upon non-constitutional grounds, it is unnecessary to address the petitioner's challenge on constitutional due process grounds.  See Owens, 908 S.W.2d at 926 ("[U]nder Tennessee law, courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties.  If issues in a case can be resolved on non-constitutional grounds, courts should avoid deciding constitutional issues." (citations omitted)).

## II.  Application of the Act

While we have determined that the Act contemplates the type of DNA analysis sought by the petitioner, the remaining question is whether he is entitled to it under the facts of these two cases.  He contends that if DNA analysis is performed on V.B.'s underwear, it has the potential to prove his innocence, as well as undermine confidence in both his convictions. Despite the fact that V.B. had consensual sex shortly before the assault, the petitioner argues that modern DNA technology has the potential to identify multiple DNA profiles if they are present.  If two male profiles are identified, both of which are inconsistent with the petitioner's DNA profile, the petitioner argues that he will be able to effectively prove his innocence or, at a minimum, undermine confidence in the convictions.  Further, even if only one DNA profile is revealed, the petitioner argues that he can satisfy his burden under the

statute if the profile is uploaded to a DNA database and returns a "hit" to a known or unknown serial offender.[25]

In response, the State contends that the petitioner has failed to establish a reasonable probability that he would not have been prosecuted or convicted even in the face of favorable DNA testing results. The State claims that the petitioner would still have been prosecuted based upon the eyewitness identification evidence and the other corroborating evidence that was available at the time of trial, and also asserts that V.B.'s consensual sexual activity would have been provided as an "alternative explanation to the jury for the presence of semen not matching the petitioner."

### A. Tenn. Code Ann. § 40-30-304(1)

Because the Court of Criminal Appeals analyzed the petitioner's claim under section 40-30-304, see Powers, 2010 WL 571801, at *7, we must determine whether the criteria of this mandatory provision have been established such that the petitioner's request for DNA analysis should be granted.[26] While, as stated, all four criteria must be established before DNA testing is required under section 40-30-304, the most important one for purposes of this case is the first: whether "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis." Tenn. Code Ann. § 40-30-304(1). The definition of "reasonable probability" has been well-established in other contexts, and is traditionally articulated as "'a probability sufficient to undermine confidence in the outcome.'" Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)); cf. Garrett, 92 Minn. L. Rev. at 1676 (noting that DNA testing statutes in most jurisdictions "require a threshold showing of 'materiality' before [DNA] testing may be granted," which is a "standard mirror[ing] the Brady [v. Maryland, 373 U.S. 83 (1963)] standard, under which materiality is a requirement for obtaining a vacatur for a constitutional violation"). Under section 40-30-304(1), therefore, prior to a mandatory order of testing, a petitioner's argument must merely establish "a probability sufficient to undermine confidence" in the decision to

---

[25] The petitioner also contends that if he proves his innocence with regard to the V.B./C.B. conviction, his other conviction would also have to be vacated based on the "signature crime" evidence and the State's repeated claims that the same person committed both crimes. The post-conviction court need not address the question, however, until results have actually been obtained.

[26] The criteria in both the mandatory and discretionary provisions of the Act are identical, save the distinctions between the first criteria. Compare Tenn. Code Ann. § 40-30-304(1) (requiring DNA analysis if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis") with Tenn. Code Ann. § 40-30-305(1) (allowing for DNA analysis if "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable"). As a result, our statements regarding the interpretation of section 304 also apply to section 305.

prosecute or in the conviction had the State or the jury known of exculpatory DNA testing results.

Inevitably, determining whether a petitioner should be afforded DNA testing involves some conjecture, as "it is difficult to anticipate what results DNA testing may produce in advance of actual testing." State v. Peterson, 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003). Under section 40-30-304(1) of the Act, however, we begin with the proposition that DNA analysis will prove to be exculpatory.[27] Payne v. State, W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *10 (Tenn. Crim. App. Dec. 5, 2007); Shuttle v. State, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *5 (Tenn. Crim. App. Feb. 3, 2004). As one jurisdiction has ruled, "the trial court should postulate whatever realistically possible test results would be most favorable to [the] defendant in determining whether he has established" the reasonable probability requirement under that jurisdiction's DNA testing statute. Peterson, 836 A.2d at 827. We hold the same to be true under Tennessee's Act.

While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State. See Haddox v. State, No. M2003-00514-CCA-R3-PC, 2004 WL 2544668, at *5 (Tenn. Crim. App. Nov. 10, 2004) ("A proper analysis by the trial court must include consideration of the effect of th[e] 'exculpatory result' on the jury."). "The Act was created because of the possibility that a person has been wrongfully convicted or sentenced," and as a result, "the [mere] fact that the victim identified the petitioner as the perpetrator should not provide a basis for denying testing." Brown v. State, No. M2002-02427-CCA-R3-PC, 2003 WL 21362197, at *2 (Tenn. Crim. App. June 13, 2003) (Tipton, J., concurring). Instead, the analysis must focus on the strength of the DNA evidence as compared to the evidence presented at trial – that is, the way in which "the particular evidence of innocence interacts with the evidence of guilt." Garrett, Claiming Innocence, 92 Minn. L. Rev. at 1646; cf. Haddox, 2004 WL 2544668, at *5 ("The proper analysis for the trial court under the DNA Analysis Act necessarily includes a consideration of the effect on the jury of evidence showing that the Petitioner's DNA was not present on the baseball cap that was worn by the perpetrator and recovered at the crime scene.").

It may also be proper to "consider . . . any stipulations of fact by the petitioner or his counsel and the state" in making this determination. Mitchell v. State, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, at *4 (Tenn. Crim. App. Apr. 11, 2003). For example, although not relied upon by the State during the first trial, both parties, based upon their pleadings in the post-conviction court, agreed that V.B. had engaged in consensual sex with

---

[27] Under section 40-30-305, of course, a court would presume that DNA analysis would prove "favorable" to the petitioner. See Tenn. Code Ann. § 40-30-305(1).

a school boy twelve hours prior to the rape. Therefore, this fact was properly considered by the post-conviction court and the Court of Criminal Appeals.[28]

The Court of Criminal Appeals has previously observed that, in reviewing a petition for post-conviction DNA testing,

> the opinions of [the Court of Criminal Appeals] on either the direct appeal of the conviction or the appeals in any previous post-conviction or habeas corpus actions may provide some assistance. These sources provide the essential facts of the crime at issue and may be helpful to trial courts in their assessment of the merits of any claim.

Powers, 2010 WL 571801, at *9 (quoting Mitchell, 2003 WL 1868649, at *4). We agree that it may be appropriate to look at previous appeals in this setting in order to discern the "essential facts of the crime at issue." As is evidenced by this case, the post-conviction court is not required by the Act to hold an evidentiary hearing in order to decide whether testing should be granted, and, therefore, the record on appeal may be limited. The recitation of the facts contained in prior appellate opinions may be helpful in determining what facts and evidence were presented at trial.

Previous appeals should not, however, be used to determine "the merits of any claim," that is, whether the reasonable probability threshold has been established. For example, in this case, the Court of Criminal Appeals, in affirming the trial court's denial of the petition, observed that "[a]s we have stated in previous opinions, the evidence against the Petitioner was overwhelming." Powers, 2010 WL 571801, at *9. Neither the Court of Criminal Appeals nor the trial court assessed the effect that exculpatory DNA testing results would have had on that "overwhelming" evidence in the eyes of either the State, as to its decision to prosecute, or the fact-finder, as to its decision to convict, but instead merely recited the evidence found in previous appeals to support the petitioner's convictions. As past cases

_____

[28] The Court of Criminal Appeals erred, however, in accepting the State's argument that there was no evidence to support the "presumption" that V.B. had only one consensual sex partner, and that "[t]he precise number of incident(s) and individual(s) is not known." See Powers, 2010 WL 571801, at *10 (observing that the petitioner's argument "rests on the . . . presumption that [V.B.] engaged in consensual sexual activity with only one individual prior to the offense" and agreeing that "the record merely shows that [V.B.] had at least one incident of consensual sexual intercourse within the twelve hour period prior to the rape," meaning that DNA testing would not be able to exonerate the petitioner). While the record is limited, it appears that both the petitioner and the State proceeded upon the assumption that V.B. had sex with a single schoolboy. While there may be little in the record affirmatively demonstrating this fact, there is even less to support the State's argument that there could have been multiple consensual sex partners. Further, engaging in this type of conjecture in favor of the State conflicts with our interpretation of the Act, which assumes results and inferences that are favorable to the petitioner.

-22-

demonstrate, however, many DNA exonerations have occurred despite the fact that there was substantial evidence supporting the conviction. See Cynthia E. Jones, The Right Remedy for the Wrongly Convicted: Judicial Sanctions for Destruction of DNA Evidence, 77 Fordham L. Rev. 2893, 2926 (2009) ("[A]s is demonstrated with over 200 exonerations, DNA evidence, standing alone, has the persuasive force to prove that an innocent person has been wrongly convicted, notwithstanding all other evidence used at trial to prove guilt beyond a reasonable doubt."); Rodney Uphoff, Convicting the Innocent: Aberration or Systemic Problem?, 2006 Wis. L. Rev. 739, 778 (2006) (discussing the Arizona case of Larry Youngblood, who, "[c]ontrary to the 'overwhelming evidence,' . . . was, in fact, innocent" and had his conviction vacated in 2000). There is nothing in the Act limiting DNA testing to only those cases in which there was tenuous evidence supporting the jury's finding of guilt. Courts, therefore, should guard against denying petitions for post-conviction DNA testing under the Act based upon an appellate court's prior determination that the evidence on direct or post-conviction appeal, which was reviewed in the light most favorable to the State, was sufficient to convict. Cf. Bruner v. State, 88 P.3d 214, 217 (Kan. 2004) (rejecting the State's assertion that the petition for DNA testing should be denied based upon the fact that the "evidence against [the petitioner] was overwhelming" and observing that there was nothing in the plain language of the statute "limiting [it] to cases where the evidence was not overwhelming"). The "reasonable probability" inquiry under section 40-30-304(1) of the Act requires courts to look at the effect the exculpatory DNA evidence would have had on the evidence at the time of trial or at the time the decision to prosecute was made, not on the evidence as construed by an appellate court in the light most favorable to the State.[29]

Because V.B. had consensual sex prior to the rape, we must analyze the petitioner's claims based upon two hypothetical scenarios: (1) that only one DNA profile will be developed from the biological material on V.B.'s underwear; and (2) that two DNA profiles will be developed. Further, we will "postulate whatever realistically possible test results would be most favorable" to the petitioner, Peterson, 836 A.2d at 827, in determining whether he has established a "reasonable probability" that he would not have been convicted or prosecuted pursuant to section 40-30-304(1).

The trial court concluded that "[e]ven if DNA results were found to belong to an unknown or a third party, those results would not prove exculpatory." This conclusion, however, evidences a "stark misapprehension of the potential probative power of DNA tests"

---

[29] The trial court, in determining that the "reasonable probability" criteria was not established, also observed that "based on the strength of the State's case, the prosecutor stated, unequivocally, that the State of Tennessee would prosecute [the petitioner] notwithstanding any DNA results." While prosecutors may certainly argue that the State would proceed to trial in the face of exculpatory DNA evidence, it is the function of the post-conviction court to independently assess the probative value of the DNA evidence and the effect it would have on the State's case.

and the effect that this type of evidence has on both law enforcement and fact-finders, particularly when such evidence would be highly indicative of the perpetrator's identity. Garrett, 92 Minn. L. Rev. at 1635. At trial, the State argued that the presence of seminal fluid on V.B.'s undergarments proved that a sexual assault occurred. The inference created by the State was that the victims' identification of the petitioner as their assailant and the corroborating evidence found both on the petitioner and in his apartment connecting him with this eyewitness identification meant that the seminal fluid found on V.B.'s underwear belonged to him. In consequence, the presence of this seminal fluid was important in establishing that the person who was responsible for V.B.'s rape was, in fact, the petitioner. Under the law, "a reasonable doubt in the mind of one or more jurors would have precluded a conviction." Haddox, 2004 WL 2544668, at *5. If we assume that only one DNA profile is developed, and that profile does not match the petitioner's, we have no trouble concluding that a reasonable probability exists that the petitioner would not have been convicted. Such evidence would have cast the State's case, and the inference between the eyewitness identification, corroborative evidence, and presence of seminal fluid on V.B.'s underwear, in a completely different light. In our view, a reasonable probability exists that this evidence might serve to cast doubt as to the identification of the petitioner, notwithstanding the other evidence to the contrary.

The State argues that it would merely have presented evidence of V.B.'s consensual sexual encounter as an alternative explanation for the presence of seminal fluid not matching the petitioner's DNA profile. For purposes of determining whether testing is warranted under section 40-30-304 of the Act, however, we must presume that testing results would prove exculpatory to the petitioner. In this case, the most favorable result to the petitioner would be that the non-matching DNA profile on the underwear would match the profile of a prior offender contained in a DNA database. Such a match would cast considerable doubt upon the identity of the petitioner as the perpetrator of V.B.'s rape. Particularly in "stranger-rape cases," "DNA [has] changed the nature of criminal investigations . . . by making it possible to exculpate or inculpate suspects." Garrett, 92 Minn. L. Rev. at 1652;[30] see also Commonwealth v. Conway, 14 A.3d 101, 113 n.14 (Pa. Super. Ct. 2011) (noting that in Pennsylvania, "data bank comparative analysis [is used] in the investigation of crimes" and that "nationwide there are a multitude of reported cases in which law enforcement agencies have used data bank information to solve crimes where the identification of the perpetrator was in question"). Under such circumstances, we must conclude that a reasonable probability exists not only that a jury would not have convicted the petitioner, but also that the State would have chosen not to prosecute him.

---

[30] In Virginia, for instance, "DNA analysis eliminates twenty-five to thirty percent of suspects in police investigations." Id. at 1652-53.

The second scenario we must consider is that two DNA profiles will be developed from V.B.'s underwear and that neither profile will match the petitioner's. Unfortunately, because V.B.'s consensual sex partner cannot be identified, his profile cannot be obtained for comparative purposes. There still exists, however, a reasonable probability that the petitioner would not have been convicted had this exculpatory result been obtained through DNA analysis. The presence of two profiles that do not match the petitioner's, coupled with the information that V.B. had consensual sex twelve hours prior to the rape, may have resulted in a reasonable inference that one of the profiles belonged to the consensual partner and the other belonged to the person responsible for the rape. While such evidence might not conclusively establish the petitioner's innocence, this is not the standard that must be met under section 40-30-304(1). Instead, the DNA evidence must merely establish "a probability sufficient to undermine confidence" in the conviction for the crime had the jury known of the exculpatory results. Had this evidence been presented at trial, there is a reasonable probability that at least one juror would not have been able to find beyond a reasonable doubt that the petitioner raped V.B., even in light of the inculpatory evidence presented by the State.[31]

### B. Tenn. Code Ann. § 40-30-304(2)–(4)

There are three additional criteria that must be satisfied under section 40-30-304 before DNA analysis will be ordered: the evidence must still be in existence and in a condition which allows for DNA analysis; the evidence must not have been previously subjected to DNA analysis; and the application must be made for the purpose of demonstrating innocence and "not to unreasonably delay the execution of sentence or administration of justice." Tenn. Code Ann. § 40-30-304(2)–(4). Here, the third criterion is clearly established, as the evidence was not previously subjected to DNA analysis. See Tenn. Code Ann. § 40-30-304(3). Discussion of the post-conviction court's disposition of the second and fourth criteria is warranted, however.

In its response to the petition for DNA testing, the State, as to the conviction for V.B.'s rape, "submit[ted] that parts 2, 3, and 4 have been satisfied" and argued only that the first, the "reasonable probability" prong, had not been established. The post-conviction court disregarded the State's concession, finding instead that "[i]t is not clear whether, after twenty-seven years, any meaningful testing could be done to determine DNA results in the [V.B.] case." Nothing in this record supports the conclusion that testing could not be accomplished. While a petitioner would be required to present scientific proof demonstrating that DNA analysis is possible when the State argues otherwise, the State, in this instance,

_____

[31] While not argued by the petitioner, it is possible that after both DNA profiles are uploaded into a DNA database, one of the profiles could match that of a known or unknown offender. Under these circumstances, we think a reasonable probability also exists that the State would not have prosecuted the petitioner.

-25-

acknowledged that an analysis could be performed. Under these circumstances, the second criterion has been satisfied.

As to section 40-30-304(4), the post-conviction court stated that, while it did not "question the Petitioner's motivations" in seeking DNA analysis, the items he sought to test had been available since trial, yet he had waited six years after the Act became law to make his request. The trial court determined that "no reasons were produced at the hearing that would justify the delay in presenting the petition." Initially, there is no statute of limitations imposed by the Act, and a petitioner "may at any time" file a petition for DNA analysis. Tenn. Code Ann. § 40-30-303 (emphasis added). Further, the petitioner is represented by the Innocence Project,[32] an organization which receives over 3,000 applications seeking assistance each year, and "at any given time" is evaluating between 6,000 and 8,000 potential cases. See Frequently Asked Questions, The Innocence Project, http://www.innocenceproject.org/Content/How_many_people_write_to_you_each_year.php (last visited May 12, 2011). Based on the number of applications received by the Innocence Project, there may be a substantial delay between a petitioner's request for assistance and a decision by the Innocence Project as to whether the case should be accepted. In light of the demands placed upon the entity representing the petitioner, we find that the petitioner's delay in filing his petition for DNA analysis is justified.

Moreover, at the time the petitioner made his request, he was serving a life sentence plus fifty years. Thus, there is no evidence that the petitioner's request was made for the purpose of "unreasonably delay[ing] the execution of [his] sentence or administration of justice." Tenn Code Ann. § 40-30-304(4); cf. Griffin, 182 S.W.3d at 800 (disagreeing with the Court of Criminal Appeals' determination that the petitioner "failed to demonstrate that his petition would 'not unreasonably delay the execution of sentence or administration of justice,'" particularly "in light of the fact that when [the petitioner] filed the petition he had been serving his sentence and continues to do so").

Because we find that all four criteria contained in section 40-30-304 have been satisfied, we hold that the petitioner is entitled to the requested DNA analysis.

**Conclusion**

_____

[32] The Innocence Project has incurred the costs thus far in the petitioner's case. According to its website, if the Innocence Project conducts testing itself, it is around $1,000. See Frequently Asked Questions, The Innocence Project, http://www.innocenceproject.org/Content/How_much_does_DNA_testing_cost.php (last visited June 10, 2011). If a private laboratory must perform the testing, it can cost as much as $8,500. Id. However, when a government laboratory conducts testing, there is generally no cost to the Innocence Project. Id.

The Post-Conviction DNA Analysis Act of 2001 was designed to permit access to a DNA database if a positive match between a profile developed from crime scene DNA and a profile contained within a database would create a reasonable probability that a petitioner would not have been prosecuted or convicted if exculpatory results from DNA analysis had been previously obtained or that the results would have rendered the petitioner's verdict or sentence more favorable. Because the criteria for ordering DNA analysis under the Act are established, the judgment of the Court of Criminal Appeals is reversed and the cause is remanded to the post-conviction court for entry of an order granting DNA analysis. Costs are assessed to the State.

_____

GARY R. WADE, JUSTICE