IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 24, 2018

**CHARLES ELSEA v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 302308   Don W. Poole, Judge**

———————————————————

**No. E2017-01676-CCA-R3-PC**

———————————————————

Petitioner, Charles Elsea, appeals the denial of his petition for post-conviction DNA analysis on unprocessed specimens relating to his October 10, 1997 conviction for first degree murder. Because we hold that even favorable DNA results from the unprocessed specimens do not create a reasonable probability that Petitioner would not have been prosecuted or convicted or would have received a more favorable verdict or sentencing, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Samuel Lewis, Chattanooga, Tennessee, for the appellant, Charles Elsea.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; and Neil Pinkston, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Petitioner's convictions stem from the brutal murder of Ernest Wayne Heard, the robbery of Jerry Hawkins, and the burning of Mr. Hawkins's car which took place during Petitioner's drunken rampage with his cousin, Ronnie Elsea, Jr., on July 30, 1996. *State v. Charles W. Elsea, Jr.*, No. 03C01-9901-CR-0031, slip op. at 3 (Tenn. Crim. App. Nov. 15, 1999). At around 11:30 p.m. on July 29, 1996, Petitioner and Ronnie Elsea, Jr., arrived at a Golden Gallon convenience store in a red Corvette. While they ran around

the store acting "crazy," the store clerk, Juanita Walker, noticed that they were wearing T-shirts and shorts. Ms. Walker described them as "drunk." They purchased some gas and beer.

Mr. Heard had spent some time with Bonnie Couch and her husband at the Patterson Creek Boat ramp on the night in question. They drank some beer, and Mr. Heard remained at the boat ramp and expressed his intent to take a nap while Ms. Couch and her husband went home. When Ms. Couch left the boat ramp, Mr. Heard was the only person there, and his Toyota was the only vehicle parked there. Upon arriving at their house, Ms. Couch saw Mr. Hawkins with her daughter, Lisa Couch, and her son, Charles Adam Couch. Later, Mr. Hawkins, Lisa Couch, and Mr. Couch left and went to the boat ramp. At the time they arrived, Mr. Couch saw a Toyota car, and he did not see anyone in the car. After staying at the boat ramp for a while, Mr. Hawkins fell asleep in the car and Lisa Couch and Mr. Couch chose to walk home. On their walk, they came across Petitioner and another man sitting by a red Corvette and drinking beer in the middle of the road. They talked to Petitioner and one of the men said, "he was on Bakewell Mountain beating the heck out of some n****rs." After Lisa Couch and Mr. Couch declined a ride home, Petitioner and the other man drove away in the red Corvette toward the boat ramp. Mr. Coach saw the Corvette's headlights go past the Toyota car and then he heard three doors slam shut.

Mr. Hawkins was in his car when he heard two voices ask him about some money. Mr. Hawkins was hit in the left jaw, and the next thing he remembered was lying on the ground and his car, a red Camaro, leaving without him. After that, Mr. Hawkins passed out while walking down the road. The next thing Mr. Hawkins remembered was the arrival of his wife. When Mr. Hawkins went to the location of his wife, they saw a body. Then, they went to a market to call the police. Mr. Hawkins's statement to the police was very different from his testimony at trial. During cross-examination at trial, Mr. Hawkins was confronted with his previous statement that he was beaten up by four or five guys in a pickup truck, and it appears that he admitted that his prior statement of the events is what actually happened. Mr. Hawkins had a hard time recalling the events that took place at any time he was asked about them.

At around 2:00 a.m., Petitioner and Ronnie Elsea, Jr., returned to the Golden Gallon and purchased a twelve-pack of bottled Budweiser. At this time, Ms. Walker described them as more intoxicated than before. She described Petitioner and Ronnie Elsea, Jr., "running around the store" and acting "wild" and "crazy." Regarding their appearance, Ms. Walker said that they were only wearing shorts and shoes, and "[t]hey had blood splattered all over them." According to Ms. Walker, they said that they either "killed two n****r q***rs on the mountain or they f**ked them up." Ms. Walker noted that they both had blood on their chests and Ronnie Elsea, Jr., had blood on his face and

knuckles. After she told them about the blood on their bodies, they said, "We f\*\*ked them up[,]" and they went to the restroom and washed up. All of these actions were captured on the surveillance video that Ms. Walker reviewed on the night in question. However, Ms. Walker erased the video recording because she was afraid that she would lose her job if someone saw Petitioner and Ronnie Elsea, Jr., stealing a case of beer.

At 6:50 a.m. on July 30, 1996, Detective Gary Gaskill arrived at the boat ramp and found Mr. Heard's Toyota car. The rear windshield of the car was broken and shattered, and the front passenger door window was broken out. A concrete cinder block was on the front dash and a "creek rock" was found in the rear floorboard. The DNA of the human blood found on both the concrete cinder block and the "creek rock" was consistent with the DNA of Mr. Heard. Brown glass pieces were found in Mr. Heard's Toyota, and those glass pieces had the same optical properties as the brown glass pieces found in Petitioner's red Corvette. Fingerprints were found on Mr. Heard's Toyota, but they did not match Petitioner. Mr. Heard's body was face down on the ground outside the car. He was partially clothed and the front pockets of his pants were turned inside out. About fifty feet from the car and Mr. Heard's body, Detective Gaskill found a white T-shirt with a Tazmanian devil on it. The T-shirt had "fluid-type stains" on it. Detective Gaskill reviewed the video surveillance from the Golden Gallon, and he observed Petitioner wearing the T-Shirt recovered from the crime scene in the videotape. Human blood was found on the T-Shirt, but the DNA test results were not conclusive. However, the partial DNA analysis that was done on the T-shirt could not be positively matched to Mr. Heard or Mr. Hawkins.

Later in the day, Detective Gaskill discovered Mr. Hawkins's car. It had been burned. The area around Mr. Hawkins's car was muddy, and Defendant's red Corvette had mud and dirt on the undercarriage when it was recovered.

Michael West, Petitioner's cellmate, testified that Petitioner told him about committing the crime. Mr. West recounted the following:

> [T]hey [came] up on . . . two vehicles that [were] parked[,] and they went over to the first one[,] and the guy was passed out and he said they [were] planning on robbing him. And the guy woke up as they opened the door and the guy had a machete or a big knife, I'm not sure what it was, but he come [sic] out at Ronnie Elsea[, Jr.,] and [Petitioner] . . . hit the guy and knocked him down and pulled him out of the car and started kicking him in the head, and then Ronnie Elsea[, Jr.,] started beating the guy with a rock or a brick[.]
>
> . . .

- 3 -

[Petitioner] looked at the guy that they had beat up and killed, and [saw] that the guy's brains or his head was mutilated pretty bad[,] and he said it made him have to use the bathroom. So[,] he used the bathroom and took his shirt off which had blood on it and wiped his self when he was through using the bathroom and left it lying there. And he said that the only thing that he knew that would hang him in this case would be fingerprints that he left on top of the car as he drug the guy out.

[A]fter that was over with[,] there was another car sitting beside the car that had another guy in it. And that guy came to as the commotion went on about all of that happening and [Petitioner] and Ronnie [Elsea, Jr.,] was afraid that the guy could identify them, so they knocked him out and left him laying there[,] and they took his car . . . [and] burnt his car[.]

Additionally, Mr. West said that Petitioner told him about putting the body in the trunk of a car. However, the body was not in the trunk of a car, and a newspaper incorrectly reported that fact. *Charles W. Elsea, Jr.*, No. 03C01-9901-CR-0031, slip op. at 12. For his testimony, Mr. West received a reduction of his sentence.

After hearing this evidence, a jury convicted Petitioner of first degree felony murder, aggravated robbery, and setting fire to personal property. *Id.* at 2. On direct appeal, this Count held "that the proof did not support a conviction of aggravated robbery" and modified "that conviction to the lesser included offense of robbery and sentence[d] the [Petitioner] to three years for that offense." *Id.* at 3. In all other respects, including sufficiency of the evidence for the other convictions, this Court affirmed the judgments of the trial court. *Id.*

Since his direct appeal, Petitioner received noticed from the District Attorney General from the 11th Judicial District that certain evidence related to Petitioner's case had been found unprocessed. Specifically, the unprocessed evidence consisted of head hair, pubic hair, nail clippings from both hands, and glass fragments. Petitioner filed a petition with the post-conviction court requesting DNA analysis of the evidence for post-conviction relief pursuant to Tennessee Code Annotated section 40-30-304. The post-conviction court summarily denied his request, and this appeal followed.

*Analysis*

On appeal, Petitioner argues that the post-conviction court erred in summarily dismissing his petition for Post-Conviction DNA analysis without an evidentiary hearing.

The State disagrees arguing that Petitioner failed to establish the statutory criteria for either mandatory or conditional DNA testing.  We agree with the State.

Post-conviction courts are afforded considerable discretion in determining whether to grant a petition under the Post-Conviction DNA Analysis Act of 2001, and the scope of our review is limited.  *Harold James Greenleaf, Jr. v. State*, No. M2009-01975-CCA-R3-CD, 2010 WL 2244099, at *4 (Tenn. Crim. App. June 4, 2010) (citing *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App. Feb. 3, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004)), *perm. app. denied* (Tenn. Nov. 15, 2010).  A post-conviction court is not required to hold a hearing to determine if a petition for post-conviction DNA analysis should be granted or denied.  *Powers v. State*, 343 S.W.3d 36, 56 (Tenn. 2011).  "In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party."  *Id.*  We will not reverse the post-conviction court's decision unless the judgment is not supported by substantial evidence.  *Greenleaf*, 2010 WL 2244099, at *4 (citing *Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App. Apr. 11, 2003)).

The Post-Conviction DNA Analysis Act provides an avenue for person convicted of "first degree murder" to "file a petition requesting forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence."  T.C.A. § 40-30-303.  The Post-Conviction DNA Analysis Act contains both a mandatory analysis provision and a discretionary analysis provision.  *See* T.C.A. § 40-30-304; T.C.A. § 40-30-305.  The mandatory analysis provision provides that a court shall order post-conviction DNA analysis if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304. The discretionary analysis provision provides that a court may order post-conviction DNA analysis if it finds that:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-305. A reasonable probability of a different result exists when potentially favorable DNA results "undermine the confidence in the outcome of the prosecution." *Greenleaf*, 2010 WL 2244099, at *4 (quoting *Sedley Alley v. State*, ("Alley II"), No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *14 (Tenn. Crim. App. June 22, 2006)). Accordingly, there is no presumption of innocence afforded to a petitioner. *Greenleaf*, 2010 WL 2244099, at *4 (citing *Alley II*, 2006 WL 1703820, at *14).

However, when considering a Post-Conviction DNA Analysis Act claim, we assume that DNA testing will reveal exculpatory evidence. *Powers*, 343 S.W.3d at 55 (citations omitted). "[T]he evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." *Id.* However, "[t]his Court cannot ignore existing evidence when considering 'potentially favorable DNA results.'" *Greenleaf*, 2010 WL 2244099, at *4 (quoting *Sedley Alley v. State*, ("Alley I"), No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *9 (Tenn. Crim. App. May 26, 2004)). The focus of our analysis must be on the strength of the assumed exculpatory evidence compared to the evidence of guilt presented at trial. *Powers*, 343 S.W.3d at 55.

"Previous appeals should not, however, be used to determine 'the merits of any claim,' that is, whether the reasonable probability threshold has been established." *Id.* at 56. Because many DNA exonerations have occurred despite substantial evidence supporting the conviction, this Court is required to "look at the effect of the exculpatory DNA evidence would have had on the evidence at the time of trial or at the time the decision to prosecute was made, not on the evidence as construed by an appellate court in the light most favorable to the State." *Id.* at 57.

First, we must determine what our assumption regarding the potential DNA results should be. In *Powers v. State*, our supreme court used "the most favorable result to the petitioner" for its assumption, not merely an assumption that the DNA profile did not match the petitioner. *Id.* at 58. Thus, we will assume that any DNA recovered from the unprocessed specimens would not match Petitioner and would match someone in a DNA database.

Next, we must determine if DNA results matching the specimens to another individual creates a "reasonable probability" that Petitioner would not have been prosecuted or convicted or would have received a more favorable verdict or sentencing. It is clear that is certainly not the case.

At best, a DNA match of the aforementioned items to another person would place that person in Mr. Heard's Toyota at some point in time. That evidence would have a miniscule effect on the evidence at the time of the decision to prosecute Petitioner, at the time of trial, or at the time of sentencing. At any of those points in time, Petitioner was linked to the death of Mr. Heard by his T-shirt, which was found in relatively close proximity to the body with fluid stains and blood on it. Petitioner also had blood on his chest when he was seen by Ms. Walker at the Golden Gallon. Ms. Walker heard a statement by either Petitioner or Ronnie Elsea, Jr., that they "killed" or "f**ked up" two people. Petitioner and his car were spotted in the area around the time of Mr. Heard's death. Finally, Petitioner's cellmate claimed that Petitioner had told him about committing the crime. If we stacked the assumed most favorable and exculpatory DNA evidence on one side of a set of scales and the inculpatory evidence on the other, the DNA evidence would not even begin to affect the scales or tip them in Petitioner's favor. Comparing weight of the assumed favorable and exculpatory evidence to that of the inculpatory evidence is like comparing the weight of a feather to that of a dump truck. Accordingly, we discern no "reasonable probability" that Petitioner would not have been prosecuted or convicted or would have received a more favorable verdict or sentencing. Thus, the post-conviction court's judgment is supported by substantial evidence.

*Conclusion*

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE