IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 3, 2024

## STATE OF TENNESSEE v. CHRIS M. JONES

**Appeal from the Criminal Court for Shelby County**
No. 08-05720        Chris Craft, Judge
_____

### No. W2023-00591-CCA-R3-CD
_____

The petitioner, Chris M. Jones, appeals from the summary dismissal of his petition filed pursuant to the Post-Conviction DNA Analysis Act of 2001, wherein he sought DNA testing of evidence related to his convictions for second-degree murder and attempted second-degree murder. After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which MATTHEW J. WILSON, J. joined. JOHN W. CAMPBELL, SR., J., not participating.

Chris M. Jones, Wartburg, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural and Factual History

The petitioner was convicted of second-degree murder, attempted second-degree murder, attempted voluntary manslaughter, using a firearm during the commission of a dangerous felony, and possession of a firearm where alcoholic beverages are served for which he received an effective sentence of twenty-three years in the Tennessee Department of Correction. *See State v. Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *1 (Tenn. Crim. App. Mar. 9, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011). This Court

affirmed the petitioner's convictions and sentence on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. *Id.* The facts giving rise to the petitioner's convictions were summarized by this Court on direct appeal as follows:

> This case arises from a parking dispute which ultimately resulted in the death of Donald Munsey at the Windjammer karaoke bar in the early morning hours of March 14, 2008.
>
> . . . .
>
> Justin Smith testified that he was sitting in his truck when the [petitioner's] truck "[j]ust came flying in around the corner . . . [and] almost hit [his] truck in parking." Mr. Smith further testified that he felt he would not be able to get his truck out of the parking spot because of the way the [petitioner] had parked his truck. However, Mr. Smith waited until the [petitioner] had gone inside the bar to speak to him about his truck. Once inside, the [petitioner] sat down with Ms. Lampley and Mary at a table near the front door and ordered a beer. Mr. Smith then approached the [petitioner] to discuss how the two trucks were parked. The testimony at trial presented several conflicting versions of exactly what was said during this conversation.
>
> Kimberly Guest, the waitress working at Windjammer that night, testified that Mr. Smith asked the [petitioner] if it was his truck outside and "if he could possibly move it because . . . the trucks were close and [he] didn't want to hit his truck." Ms. Guest testified that "there was no indication that there was any kind of problem," there was no physical contact between the two men, and she did not hear any "threatening language." Stephanie Ravinuthala, a patron at the bar that night, testified that Mr. Smith asked the [petitioner] if he drove a gray truck and told the [petitioner] that he was "parked like three inches from [Mr. Smith's] bumper and [Mr. Smith could not] get out." Ms. Ravinuthala also testified that Mr. Smith did not appear to be belligerent and that she did not recall Mr. Smith cursing at the [petitioner].
>
> Mr. Smith testified that when he asked the [petitioner] to move his truck, the [petitioner] responded by saying "f**k you . . . I'm not moving it." On cross-examination, Mr. Smith repeatedly denied threatening or being aggressive with the [petitioner] but admitted that after the [petitioner] told him "f**k you," he was "rude" toward the [petitioner]. However, Ms. Lampley testified that Mr. Smith approached the [petitioner] intoxicated,

"very loud, very arrogant" before asking the [petitioner] "if that was his f***ing truck outside." Ms. Lampley testified that the [petitioner] was very calm during this exchange and told Mr. Smith he would move his truck when Mr. Smith was ready to leave.

At some point after their conversation, both Mr. Smith and the [petitioner] went outside. Gary Miller was working at the front door, checking IDs, that night and testified that he overheard the two men "discussing the way the [trucks] were parked." Mr. Miller also testified that at some point two or three other men joined the conversation. According to Mr. Miller, the [petitioner] asked the men "did they not realize that he was a police officer by the tag that was on the truck." Mr. Miller further testified that there was no physical contact between the [petitioner] and any of the three or four people with him. Mr. Smith testified that he went outside with the [petitioner] because the [petitioner] "wanted to show me his license plate." The [petitioner] told Mr. Smith that "he was a cop and he had the tag on his truck." Mr. Smith testified that after their conversation outside, he did not speak to the [petitioner] again that evening.

Mr. Smith's friend, William Bobbitt, testified that he was near the front door when Mr. Smith and the [petitioner] went to look at the trucks. On their way back to the front door, Mr. Bobbitt overheard the [petitioner] say that he was not going to move his truck and that Mr. Smith should look at his license plate. Someone asked the [petitioner] what he meant by this, and he replied that he was a police officer. Mr. Bobbitt testified that the [petitioner] spoke with an aggressive tone but that there was no physical contact between the [petitioner] and anyone outside. Mr. Bobbitt further testified that everyone went back inside after Mr. Munsey stepped outside and told them to come in.

Ms. Lampley testified that before the [petitioner] and Mr. Smith went outside, Mr. Smith made a phone call and a short time later "[a]bout [ten] guys around the age of 21 to 25 showed up" and were looking at the [petitioner]. Ms. Lampley testified that the [petitioner] looked scared when he came back inside. Ms. Lampley testified that she felt threatened because this group of men continued to stare at the [petitioner] and her. However, on cross[-]examination Ms. Lampley admitted that she was "making some jump here . . . that Mr. Smith called people and that as a result of those calls, people arrived."

. . . .

- 3 -

After the [petitioner] reentered the bar, David Eagan approached him to discuss the parking situation . . . . Mr. Eagan testified that he "asked [the petitioner] to move his truck and . . . just to calm down and everything was going to be okay . . . ."

Several witnesses saw the confrontation between the [petitioner] and Mr. Eagan inside the bar. Ms. Ravinuthala testified that she saw Mr. Eagan "lean[ ] down into [the petitioner's] face" when he spoke to him and that the petitioner responded by standing up and getting in Mr. Eagan's face. Joe Reynolds was working at the bar that night and testified that he saw the [petitioner] and Mr. Eagan "talking about the parking place or something." Mr. Reynolds testified that the [petitioner] had an ink pen in his hand and was "gripping [it] so tight that his knuckles were white." Mr. Reynolds decided to get Mr. Eagan to move away from the [petitioner] . . . .

. . . .

Mr. Reynolds approached the [petitioner] and had a second conversation with him as the [petitioner] stared at Mr. Eagan and Mr. Smith. Mr. Reynolds asked the [petitioner] if he was okay, and the [petitioner] pointed at Mr. Eagan and said, "I'm going to kill that motherf***er right there." Then the [petitioner] pointed at Mr. Smith and said, "I'm fixing to kill his punk ass buddy and if any of his buddies over there even approach me, I'm going to kill all of them motherf***ers." Mr. Reynolds told the [petitioner] to calm down, and the [petitioner] responded by saying, "I've lost my wife and I've lost my family and I've lost my home and I got nothing else to lose." Ms. Flynn and Ms. Ravinuthala both overheard the [petitioner] threaten to kill Mr. Smith and Mr. Eagan. Mr. Flynn overheard the [petitioner] say he had nothing left to lose. Ms. Flynn testified that the [petitioner] was clenching and unclenching his fists as he spoke with Mr. Reynolds. Mr. Flynn also testified that the [petitioner] seemed very upset as he spoke with Mr. Reynolds. Mr. Reynolds again told the [petitioner] to calm down but was called away to the office to answer a telephone call.

. . . .

After Mr. Reynolds left the [petitioner], Mr. Eagan paid his bar tab and began to walk toward the door. The [petitioner] pulled out a gun, ran toward Mr. Eagan, grabbed Mr. Eagan by his shirt collar, and put a gun to

- 4 -

his head. Mr. Eagan testified that the [petitioner] said, "I'm going to kill you. I have nothing to lose."

The testimony at trial presented conflicting accounts of what happened next. Mr. Flynn testified that the bar was crowded that night and there were lots of people standing near the [petitioner] and Mr. Eagan. Ms. Guest testified that she was near the [petitioner] and overheard him say, "who's the tough guy now, motherf***er . . . the tough guy's got the gun." Ms. Guest further testified that she asked the [petitioner] "please don't do this" when Mr. Munsey grabbed the [petitioner] from behind. According to Ms. Guest, Mr. Eagan then fainted, knocking down the [petitioner], Mr. Munsey, and Ms. Guest as he fell to the floor. Ms. Guest then heard two or three gunshots and saw that Mr. Munsey had been shot in the neck.

Mr. Bobbitt testified that he and Mr. Munsey were in the kitchen when they saw the [petitioner] grab Mr. Eagan. Mr. Bobbitt also testified that he did not see a gun from where they were standing. Mr. Bobbitt and Mr. Munsey then charged toward the [petitioner] and tackled him. All four men fell to the ground; however, Mr. Bobbitt testified that while the men were on the ground, no one hit the [petitioner]. Mr. Bobbitt also testified that Ms. Guest was not involved at all. Mr. Bobbitt then heard two gunshots and ran out of the building. Mr. Smith similarly testified that Mr. Bobbitt and Mr. Munsey tackled the [petitioner]. After hearing the first gunshot, Mr. Smith ran out the front door, and out of the corner of his eye, he saw the [petitioner] aiming the gun at him. Mr. Smith was then shot in the buttock. Mr. Eagan testified that he did not remember anything after he fell to the ground.

Mr. Flynn and Ms. Ravinuthala both testified that they saw Mr. Munsey tackle the [petitioner] and that both men and Mr. Eagan fell to the floor. Ms. Ravinuthala testified that she saw the [petitioner] and Mr. Munsey "wrestle" on the ground for a minute. The [petitioner] then pulled himself up, aimed his gun at Mr. Munsey's head, and fired it. Next, the [petitioner] turned and aimed his gun at Mr. Smith before firing a second time. Mr. Miller had left the bar earlier to run an errand, and when he returned, he discovered Mr. Munsey's body lying on the floor with Ms. Guest kneeling next to him. Mr. Miller saw the [petitioner] seated by the front door. He told the [petitioner] to remove the magazine from his gun and to lay them on a table, and the [petitioner] complied.

*Id.* at *1-5.

- 5 -

In May 2013, the petitioner filed an untimely petition for post-conviction relief. After a hearing, the post-conviction court dismissed the petition, finding that the petitioner feigned mental illness and that the petition was, therefore, untimely. *Jones v. State*, No. W2017-00405-CCA-R3-PC, 2018 WL 3157013, at *7 (Tenn. Crim. App. June 27, 2018), *no perm app. filed.* On appeal, this Court affirmed the ruling of the post-conviction court. *Id.* at *1.

In February 2017, the petitioner filed a petition for writ of error coram nobis based on "actual innocence" and "newly discovered evidence." *Jones v. State*, No. W2017-00706-CCA-R3-ECN, 2018 WL 2264088 (Tenn. Crim. App. May 17, 2018), *no perm. app. filed*. The trial court dismissed the petition, finding that it had been filed outside the statute of limitations and that the petitioner failed to present new evidence. On appeal, this Court affirmed the ruling of the trial court. *Id.* at *6.

In March 2023, the petitioner filed the instant petition requesting DNA analysis of the shell casings collected at the crime scene under the Post-Conviction DNA Analysis Act. The petitioner claimed that the casings were not originally subjected to DNA analysis and that touch DNA analysis, which was not available at the time of his trial, would have prevented his prosecution and conviction as it would have established his actual innocence. On April 1, 2023, the post-conviction court entered a written order summarily dismissing the petition. In support of its ruling, the post-conviction court held,

> Even if those shell casings still existed more than 14 years after his conviction, and DNA were found on those casings that did not belong to the [petitioner], that would in no way prove the [petitioner]'s innocence. It would at most prove that someone else may have touched those casings, either when loading them into a gun clip he used or in collecting or storing them during the years that have passed from the shooting in 2008, 15 years after the killing of the victim. Again, this 2007 shooting was observed by many persons during the struggle that occurred prior to the shooting, and at trial several witnesses at the bar testified that they saw the shooting, and there was no testimony that any other gun was fired by anyone else on the scene when the victim fell, shot in the neck, by the [petitioner]. This court, pursuant to Tenn. Code Ann. §40-30-304 (1), finds that a reasonable probability does not exist that the petitioner would not have been prosecuted or convicted if other DNA would be found on these casings through DNA analysis, because several eye witnesses observed the shooting committed by [the petitioner] and any test results would not be exculpatory. This court also finds, pursuant to Tenn. Code Ann. § 40-30-305(1), that a reasonable probability does not exist that if DNA were found that does not belong to the [petitioner] on those shell casings, that those results would have rendered the petitioner's verdict

- 6 -

or sentence more favorable if the results had been available at his trial. This motion should therefore be dismissed without the appointment of an attorney.

This timely appeal followed.

## *Analysis*

On appeal, the petitioner contends the post-conviction court erred in summarily dismissing his claim and in doing so without the appointment of counsel. The State insists the record supports the post-conviction court's determination that the petitioner failed to make a prima facie case for DNA analysis, and, therefore, the court did not err in dismissing the instant petition without the appointment of counsel. Upon our review of the record and the applicable law, we agree with the State and affirm the ruling of the post-conviction court.

The Post-Conviction DNA Analysis Act of 2001 ("the Act") provides that a petitioner convicted of specific offenses, including first-degree murder,

> may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303. "[T]here is no statutory time limit on requests for testing and 'the right to DNA analysis under the Act may not be waived by implication.'" *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011) (quoting *Griffin v. State*, 182 S.W.3d 795, 799 (Tenn. 2006)); *see* Tenn. Code Ann. § 40-30-303 (providing that a petitioner "may *at any time*" file a petition for DNA analysis) (emphasis added).

A post-conviction court is given considerable discretion in determining whether to grant the petitioner relief under the Act. *Haddox v. State*, No. M2003-00514-CCA-R3-PC, 2004 WL 2544668, at *2 (Tenn. Crim. App. Nov. 10, 2004) (citing *Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App. Feb. 3, 2004)). Consequently, this Court will not reverse a post-conviction court's judgment unless it is not supported by substantial evidence. *Id.* (first citing *State v. Hollingsworth*, 647 S.W.2d 937, 938 (Tenn. 1983); and then citing *Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App. Apr. 11, 2003)).

- 7 -

Tennessee Code Annotated section 40-30-304 is mandatory, providing that once the State has been notified and given the opportunity to respond, the court shall order DNA analysis pursuant to the Act if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304.  The Act also has a discretionary section, which states that after the State has been notified and given the opportunity to respond, the post-conviction court *may* order DNA analysis if it finds that "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction," and the petitioner has satisfied the other three requirements. *Id.* § 40-30-305.  Under either the mandatory or discretionary sections, all four requirements must be met before DNA analysis will be ordered by the court.  *Powers*, 343 S.W.3d at 48.

Here, the post-conviction court based its summary dismissal on both sections 40-30-304 and 40-30-305.  Therefore, we must determine whether the criteria of this mandatory section were established by the petitioner.  While all four criteria must be satisfied before DNA testing is required under section 40-30-304, the most important criterion in this case is the first, namely whether "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis[.]"  Tenn. Code Ann. § 40-30-304(1).  A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'" *Powers*, 343 S.W.3d at 54 (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).  Consequently, before a mandatory order of testing is given, the petitioner must establish "'a probability sufficient to undermine confidence' in the decision to prosecute or in the conviction had the State or the jury known of exculpatory DNA testing results."  *Id.* at 55.

When considering whether section 40-30-304(1) has been established, we must "begin with the proposition that DNA analysis will prove to be exculpatory."  *Id.* (footnote

omitted) (first citing *Payne v. State*, W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *10 (Tenn. Crim. App. Dec. 5, 2007); and then citing *Shuttle*, 2004 WL 199826, at *5). "While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." *Id.* (citing *Haddox*, 2004 WL 2544668, at *5).

This Court has recognized that the facts of the offense are "paramount" to this Court's review of an issue under the Act. *Greenleaf, Jr. v. State*, No. M2009-01975-CCA-R3-CD, 2010 WL 2244099, at *3 (Tenn. Crim. App. Nov. 15, 2010). However, "the post-conviction court is not required by the Act to hold an evidentiary hearing in order to decide whether testing should be granted . . . ." *Powers*, 343 S.W.3d at 56. When considering the effect that exculpatory DNA evidence would have had on the fact-finder or the State, the post-conviction court must consider all available evidence, including the proof presented at trial and any stipulations of fact made by either party. *Id.* at 55-56; *Shuttle*, 2004 WL 199826, at *4; *Mitchell v. State*, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, at *4 (Tenn. Crim. App. Apr. 11, 2003). "The recitation of the facts contained in prior appellate opinions may be helpful in determining what facts and evidence were presented at trial." *Powers*, 343 S.W.3d at 56. However, "[t]he 'reasonable probability' inquiry under section 40-30-304(1) of the Act requires courts to look at the effect the exculpatory DNA evidence would have had on the evidence at the time of trial or at the time the decision to prosecute was made, not on the evidence as construed by an appellate court in the light most favorable to the State." *Id.* at 57 (footnote omitted).

Here, the identity of the petitioner as the shooter was not in question. Several eyewitnesses testified to hearing the petitioner threaten Mr. Eagan. They then witnessed the petitioner grab Mr. Eagan, point his gun at Mr. Eagan, again threaten to kill Mr. Eagan, and then shoot Mr. Eagan. The witnesses then saw the petitioner point his gun at Mr. Smith, who was fleeing the bar, and shoot him. Based on the proof, even if the petitioner's requested DNA testing produced the DNA of someone other than the petitioner, this evidence would not be exculpatory because it simply shows that someone else touched the shell casings at some time. As noted by the trial court, any DNA could have come from someone other than the petitioner loading the weapon or from someone handling the casings when or after they were collected at the crime scene. Accordingly, no reasonable probability exists that the petitioner would not have been prosecuted or convicted if this evidence had been obtained through DNA analysis. Therefore, the post-conviction court properly exercised its discretion in summarily dismissing the petition in this case.

Additionally, the petitioner claims the post-conviction court erred in failing to appoint him counsel. The Act, however, does not entitle the petitioner to the appointment of counsel. Rather, the appointment of counsel is discretionary under the Act. *See id.* §

40-30-307 (providing that the court "may" appoint counsel for an indigent petitioner). Moreover, it is well established that the Act's procedures do not violate due process. *See Estate of Alley v. State*, 648 S.W.3d 201, 228 (Tenn. Crim. App. 2021) (recognizing that the state-imposed requirements for obtaining DNA analysis under the Act do not create any unconstitutional deprivation of due process rights). Accordingly, the trial court did not err in summarily dismissing the petition without the appointment of counsel.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.

_____
J. ROSS DYER, JUDGE