IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

**JOSEPH WILSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-22-34  Kyle C. Atkins, Judge**

_____

**No. W2023-00192-CCA-R3-PC**
_____

The Petitioner, Joseph Wilson, was convicted in 2001 by a Madison County Circuit Court jury of a number of offenses, including attempted second degree murder and three counts of aggravated rape, based on his having raped and cut the throat of a woman during his participation with accomplices in burglarizing her home.  In February 2022, the Petitioner filed a petition pursuant to the Post-Conviction DNA Analysis Act of 2001, Tennessee Code Annotated section 40-30-301, *et. seq*., for DNA analysis of the sexual assault kit, the knife used to cut the victim's throat, the clothing the victim was wearing at the time of the assault, and assorted other items recovered from the bathroom where the sexual assault occurred, asserting that "significant technological developments in forensic methodologies over the last fifteen years [have occurred] that may now make it possible to conclusively identify the true perpetrator[.]"  Following a hearing, the post-conviction court denied the petition, finding that the Petitioner had not shown there was a reasonable probability that he would not have been prosecuted or convicted or that new DNA testing would resolve an issue that had not been previously resolved.  On appeal, the Petitioner argues that the post-conviction court erred in finding that the Petitioner did not satisfy the requirements for DNA analysis pursuant to the Post-Conviction DNA Analysis Act.  The State concedes that DNA analysis of the sexual assault kit and the knife is warranted but argues that it is not warranted for the other pieces of evidence.  We agree with the State that DNA analysis is warranted for the sexual assault kit and unwarranted for the items collected from the bathroom and for the victim's clothing that was not collected as part of the sexual assault kit.  However, we disagree that DNA analysis is warranted for the knife.  Accordingly, we reverse the denial of the request for DNA analysis of the sexual assault kit but affirm the denial of the request for DNA analysis of the knife and additional items.  Thus, we affirm in part, reverse in part, and remand for entry of an order for DNA testing consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Tara Thompson, New York, New York, Exoneration Project, and Alexander Camp, Jackson, Tennessee (at hearing and on appeal); and Jessica K. Spencer, New York, New York, Innocence Project, and Paul Bruno, Nashville, Tennessee (on appeal), for the appellant, Joseph W. Wilson.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**<u>FACTS</u>**

On June 2, 2001, the Petitioner was convicted of attempted second degree murder, three counts of aggravated rape, especially aggravated robbery, especially aggravated burglary, conspiracy to commit aggravated burglary, theft, and vandalism based on his participation with accomplices Jason White, Rodney Smith, and Brandon Taylor in the November 27, 1999 burglary of a Madison County home, during which the Petitioner repeatedly raped the seventy-year-old widowed homeowner before cutting her throat with a knife. At the time of the offenses, the Petitioner was less than a month from his seventeenth birthday, but at the time of the 2001 trial, the Petitioner was eighteen, Taylor was nineteen, White was twenty, and Smith was twenty-two.[1] The victim made a positive courtroom identification of the Petitioner as the man who orally and vaginally raped her before cutting her throat and leaving her for dead on the floor of the small bathroom where the rapes occurred.

Our direct appeal opinion provides the following summary of the victim's trial testimony:

_____

[1] We have taken judicial notice of the appellate record from the Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c).

- 2 -

During the early morning hours of Saturday, November 27, 1999, the seventy-year-old victim awoke when intruders entered her home. The victim identified the intruders as the [Petitioner] and Jason White. She stated the [Petitioner] instructed her to get out of bed. She said that when she complied, the [Petitioner] placed a knife to her throat and walked her down the hall into the den, where he asked her for money. She testified that after the intruders took six dollars from her purse, the [Petitioner] took her into a bathroom and sat her on the commode.

The victim stated the intruders tied her hands behind her back with a towel. She said the [Petitioner] placed his penis in her mouth and threatened to cut her throat if she did not perform fellatio. The victim testified that when she did not perform to the [Petitioner's] satisfaction, he then threw her to the floor, removed her clothing, and inserted his penis into her vagina. Her vagina was torn and required stitches.

According to the victim, the [Petitioner] then pulled her off the floor and struck her head against a wall. The victim stated the [Petitioner] "rant[ed] and rav[ed]," and called her a "whore" and a "bitch." She testified the [Petitioner] again placed his penis back into her mouth, threatened to cut her throat if she did not perform fellatio, and kicked her. The victim testified she asked the [Petitioner] why he was doing this, and he replied, "Because you didn't have much money."

The victim stated that during the rapes, White kept telling the [Petitioner], "We need to go." She said that when White had a question about the rifles in her gun cabinet, the [Petitioner] went out of the bathroom and gave instructions on which guns to take. She said the intruders asked her for her car keys, and she told them they were by the back door.

She testified that before the intruders left, the [Petitioner] cut her throat and said, "Now, bitch, I guess you'll call the police." She stated she felt blood gushing but lay still and pretended to be dead. After the intruders left, the victim fled to her daughter's nearby home, where her daughter and son-in-law obtained emergency assistance for her. The victim was transported to the hospital, where doctors performed surgery to repair the huge, gaping laceration to her throat and the laceration in her vagina. Miraculously, the victim survived.

*State v. Wilson*, No. W2001-03007-CCA-R3-CD, 2003 WL 261939, at *1 (Tenn. Crim. App. Feb. 3, 2003), *perm. app. denied* (Tenn. May 27, 2003).

The victim testified that the Petitioner at one point ordered White to guard the bathroom door while the Petitioner left the bathroom. *Id.* at *2. She said that White never touched her and never entered the bathroom. *Id.*

Each of the Petitioner's three accomplices testified against the Petitioner at trial. *Id.* at *2-4. Our review of the trial transcript reveals that each acknowledged having received a plea bargain in exchange for his trial testimony, with Jason White pleading guilty to a number of offenses in the instant case and to an offense in an unrelated case in exchange for the prosecutor's recommendation that he receive an effective sentence of twenty-one years in the Tennessee Department of Correction with no probation. According to each accomplice's trial testimony, Taylor's role was to drive his vehicle up and down the road while the Petitioner, White, and Smith burglarized the home, but Taylor instead left after dropping the three others off. *Id.*

During his trial testimony, Jason White described how the Petitioner led the victim to a small bathroom off a hallway and how White followed the Petitioner's instructions by guarding the victim while the Petitioner retrieved what appeared to be a white scarf, which the Petitioner used to tie the victim. *Id.* at *2. White testified that he never entered the bathroom. *Id.* He also described hearing the angry Petitioner hit and kick the victim while cursing her, his having refused the Petitioner's suggestion that he join the Petitioner in raping the victim, seeing the victim lying on the bathroom floor with her throat cut, and the Petitioner's having told him as they were leaving the home that the victim would be unable to call for help because the Petitioner had cut the victim's telephone lines. *Id.* at *2-3. White testified that after he, the Petitioner, and Rodney Smith left the victim's home in the victim's white Cadillac, they met back up with Brandon Taylor and then burglarized another home, with the Petitioner gaining entry by using his knife to cut a window screen in the home. *Id.* at *3. White acknowledged that he also had a knife during the offenses, but he denied that he used it on the victim. *Id.*

Our review of the trial transcript reveals that White testified that after the group committed the second burglary, they picked up the Petitioner's brother, Jason Wilson, and drove to a Super 8 motel, where White went alone to the motel room of Chris Kennon and April, whose last name at that time was Thompson. White stated that he gave April some of the jewelry he had taken from the victim's home. He said that when the couple asked where he had obtained the Cadillac, he told them that they had just broken into someone's home, that he believed the lady was dead, and that they had stolen her vehicle.

- 4 -

Rodney Smith testified at trial that he entered the victim's home with the Petitioner and White, and that he broke into the victim's gun cabinet but immediately left with some rifles when he heard the victim's voice. *Id.* at *3. He later went back inside to help search for the victim's car keys. *Id.* While inside, he heard the Petitioner threaten to kill the victim and heard the victim, while in the bathroom, ask the Petitioner why he was doing this. *Id.* Smith said he never entered the bathroom. *Id.* He testified that after leaving the victim's home in her white Cadillac, he, the Petitioner, and Jason White met up with Brandon Taylor at Taylor's home and then went to another home, where the Petitioner used his knife to cut a window screen to gain entry. *Id.*

Among other evidence presented by the State was the testimony of Madison County Sheriff's Department Deputy David Ward, who recovered a blood-stained knife from the ground beneath the window of the second burglarized home. *Id.* From our review of the trial transcript, it is apparent that Deputy Ward was not wearing gloves when he handled the knife. When questioned on redirect examination whether he "look[ed] at the knife . . . from the standpoint of looking for fingerprints[,]" Deputy Ward responded that his own fingerprints would have been on the knife because he picked it up from the ground and examined it.

Tennessee Bureau of Investigation ("TBI") forensic scientist Margaret Bash testified that DNA testing showed the victim's blood on the knife. *Id.* at *4. She stated that no blood was found on the Petitioner's coat and no semen was found on the vaginal and oral swabs collected from the victim. *Id.*

In addition to testifying in his own defense, the Petitioner presented a number of alibi witnesses who testified that he was with them at the home of Ande Braddock on the night of the offenses. *Id.* He also presented as a defense witness April Kennon, formerly known as April Thompson, who testified that in the early morning hours of November 27, 1999, Jason White, accompanied by some other men, arrived at her hotel in a white Cadillac. *Id.* She said that White had a bloody knife and told her that he had cut the throat of a woman because she did not have much money. *Id.* She acknowledged she had given a statement to law enforcement in which she said that the Petitioner was one of the men with White in the Cadillac. *Id.* The Petitioner also presented proof that none of the fingerprints lifted from the victim's gun cabinet and the Cadillac were his, and that "tests failed to reveal any fiber transfers between the [Petitioner's] and the victim's clothing or other items." *Id.*

The Petitioner's convictions were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. *See id.* at *1. The Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court

- 5 -

summarily dismissed as untimely. *Wilson v. State*, No. W2005-00808-CCA-R3-PC, 2006 WL 3085501, at *1 (Tenn. Crim. App. Oct. 31, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007). This court affirmed the summary dismissal, and our supreme court denied the Petitioner's application for permission to appeal. *Id.*

On May 27, 2005, the Petitioner filed a pro se petition pursuant to the Post-Conviction Analysis Act of 2001 seeking DNA testing of eighteen pieces of evidence that he asserted had either not been analyzed for DNA "or not tested to determine the presence of the co-defendants' DNA." *Wilson v. State*, No. W2006-00685-CCA-R3-PC, 2007 WL 1227469, at *1 (Tenn. Crim. App. Apr. 26, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007). The Petitioner acknowledged that the lack of his DNA on the items would not conclusively exclude him as the perpetrator but asserted that "the presence of another co-defendant's DNA would show impeachment of their testimony as to never going into the bathroom where the actual rape occurred and would have created a reasonable probability that [the Petitioner] 'would not have been convicted." *Id.* at *5.

On May 13, 2006, the post-conviction court summarily dismissed the petition, concluding that the Petitioner's request met none of the criteria set forth in Tennessee Code Annotated section 40-30-304 for post-conviction DNA analysis. *Id.* at *6. On appeal, this court affirmed the summary dismissal of the petition, albeit on a different ground, concluding that with no evidence that the DNA of the Petitioner's codefendants "was among the biological specimens gathered at the time of the offense[,]" and "nothing in the language of the Act that authorizes a court to order an individual to provide a DNA sample[,]" the relief sought by the Petitioner was not authorized by the Act. *Id.* at *8-9.

On February 8, 2022, the Petitioner, represented by counsel, filed his second petition pursuant to the Post-Conviction DNA Analysis Act of 2001, the denial of which forms the basis for the instant appeal. In his 2022 petition, the Petitioner sought both DNA testing and fingerprint analysis of various items of evidence. However, on appeal, he challenges only the denial of his request for DNA testing of the victim's sexual assault kit, the knife used to cut the victim's throat, the pajamas, underwear, and robe the victim was wearing at the time of the assault, and the following items collected from the bathroom where the rapes took place: a white slip; a white pillowcase; two green bathroom rugs; a pink towel; a yellow and white washcloth; a white towel; the victim's red gown; and an additional towel and washcloth.

As an attachment to his 2022 petition, the Petitioner included the April 1, 2003 affidavit of Rodney Smith, who at the time was a fellow inmate with the Petitioner at the West Tennessee State Penitentiary. Smith stated in the affidavit that he had been coerced by the prosecution into his statements and testimony against the Petitioner and that the

Petitioner had not participated in the crimes or been present at the crime scene.[2] In addition to citing the lack of DNA or fingerprint evidence linking him to the crimes, the Petitioner also cited what he characterized as "limits to [the victim's] identification" of him as the perpetrator: that she was not wearing her glasses during the attack; that she admitted in a prior hearing that she kept her eyes closed during much of the ordeal; her testimony at a prior hearing that Jason White was the only person she could identify; her testimony at a prior hearing that she probably would be able to recognize her attacker if she saw him but could not visualize what he looked like at the moment; and the victim's having first identified the Petitioner when he was sitting at the defense table in court.

At the December 5, 2022 evidentiary hearing, Huma Nasir, an expert in forensic serology and DNA analysis, opined that additional DNA testing of the evidence would have a reasonable probability of producing results that could potentially identify either the perpetrator or "foreign" DNA, *i.e.* DNA that originated from someone other than the victim. She testified that current testing methodologies were more sensitive in that they were able to detect "degraded and old DNA[,]" and "more discriminatory in that they test for a lot more genetic markers than were tested back in 2001." She stated that the prior testing of the victim's sexual assault kit had shown no seminal fluid and only the victim's DNA. Due to the advancements that had taken place since that initial testing, she recommended that the sexual assault kit be retested for seminal fluid in case there was a "very small quantity of sperm cells that might have been missed" in the earlier testing. She said that even if no seminal fluid or sperm cells were present, there could be male DNA in the form of epithelial cells, or skin cells, which could now be detected using "autosomal STR" or "Y-STR testing." In addition, it was now possible to test the victim's pubic hair combings for the presence of male DNA in the form of epithelial cells, which was not possible at the time of the original testing.

Ms. Nasir agreed that DNA testing methodologies had not only improved since 2001, but also since 2006 and explained that they now had the ability to look for DNA at markers that could not have been searched in 2006: "So back in 2006, whereas we may have been testing for 15 markers for autosomal STR or 17 markers for Y-STR, we now have kits that test for 21 markers for STR testing, or 23 markers for Y-STR testing." She testified that the sexual assault kit's having been obtained in 1999 should not impact their ability to conduct improved DNA testing as long as the evidence was stored in a sealed condition with the temperature properly maintained.

---

[2] We note that Smith expressed reluctance to testify at the Petitioner's trial. In a jury out hearing prior to his testimony, his defense counsel stated that Smith had previously been attacked in the jail and feared retaliation for his testimony if his face was televised. After a recess, Smith's defense counsel announced that the media outlet filming the trial had agreed to focus the camera somewhere other than Smith's face during his testimony.

Ms. Nasir testified that the TBI testing of the knife used to cut the victim's throat showed that the blade was positive for blood and that the blood matched the victim's DNA profile. From her review, it appeared that the TBI did not analyze the handle of the knife. She said that when the TBI testing was done in 2001, forensic scientists were not able to test for "low copy DNA or DNA that is known as touch DNA samples." She stated that the TBI's conclusion that the DNA profile obtained from the blood was that of the victim was accurate but incomplete because, based on her review of the TBI report, it was apparent that there was "a very small quantity of male DNA present" in the sample. She expressed her belief that additional testing using current methodologies could result in a male DNA profile from the knife handle that could be submitted to CODIS for identification of the perpetrator:

> Sure. Given that there is a Y chromosome peak present at the sex determinant marker, it appears that there is a small quantity of male DNA present. And if we were to go back and test the handle of that knife and swab it for touch DNA from the person who handled the knife, there is a reasonable possibility that you could obtain the DNA profile of the person who handled that knife from the testing of the handle.

She testified that if the knife was regularly handled by the perpetrator "and they constantly shed their cells on to this knife and it wasn't wiped or cleaned or washed, . . . there is a reasonable possibility that you would find quite a bit of their DNA on the handle in the form of sweat or epithelial cells." When asked if an investigator's having picked up and handled the knife would have an impact on the ability to find the perpetrator's DNA, she responded that it would not as long as the person who handled the knife was wearing gloves. Similarly, someone having demonstrated the knife to the jury would not impact the ability to obtain the perpetrator's DNA profile as long as the demonstrator was wearing gloves: "If they were wearing . . . a glove, then they didn't deposit their own DNA hopefully onto the knife, so then it shouldn't affect the ability to get a profile from the handle."

Ms. Nasir testified that any attempt that might have been made to collect fingerprints from the knife should not have an impact on the ability to find the perpetrator's DNA on the knife, as long as the knife was not cleaned or wiped off. She said she was familiar with a "rule-out profile or rule-out testing" and explained that it was the process of obtaining a DNA profile from an individual known to have handled an item in order to rule out that individual in a case in which a "mixture profile" was obtained. She then agreed that, if their identities were known, it would be possible to obtain DNA profiles from an investigator who might have picked up the knife or from laboratory personnel who might have handled the knife to "rule them out as possible candidates."

Ms. Nasir testified that, from her review of the TBI report, the victim's underwear, pajamas and robe had never been subjected to DNA testing. She said she recommended that the underwear, pajamas and robe be tested for the presence of seminal fluid or sperm cells. She stated it was also possible that touch DNA might be found on those items if the perpetrator came into contact with them. She did not know what item was used to tie the victim, but her understanding was that a slip, a pillowcase, and some towels had been collected from the bathroom where the sexual assault occurred. When asked if she would recommend touch DNA analysis if any of those items had been used as the ligature, she responded:

> Yes. If any of those items were used as a ligature, that means that the perpetrator came into contact with those items, as well. And, again, if they were - - their hands were sweating and they were shedding their skin cells, their epithelial cells may be present on any of these items. So they can be tested for touch DNA, as well.

Ms. Nasir testified that touch DNA testing was not available in 2001 and, although available in 2006, "most of the forensic laboratories were not doing touch DNA testing at that time." She recommended that other items that had been collected from the bathroom be tested for touch DNA as well, explaining "since they were found at the crime scene where there is possible struggle between the victim and the perpetrator, . . . if they [the perpetrator] had touched or came into contact with any of those items then they would have transferred their DNA onto these materials."

On cross-examination, Ms. Nasir acknowledged that anyone who handled the knife without gloves would have left his or her DNA on it. She further acknowledged that, if proper techniques were not used, it would be possible for DNA to be transferred to the handle or blade of the knife when it was tested for fingerprints, and she agreed that was the reason that laboratories usually test for DNA first.[3] She admitted she did not know if the investigators were wearing gloves or how the jury might have handled the knife or other items. She acknowledged that it was possible for anyone who handled an item while gloved to transfer his DNA to the item through cross-contamination if he did not follow the proper procedure used by forensic scientists in donning and removing gloves. She further acknowledged that she did not know where the perpetrator touched the victim's clothing, if he touched any of the other items in the bathroom, or whether anyone else rubbed against

---

[3] Although the Petitioner asserts in his petition that the knife used to cut the victim's throat was never subjected to fingerprint analysis, the TBI "Latent Fingerprint Report," which he attached as an exhibit to his petition, states with respect to the knife: "Examination failed to reveal the presence of identifiable latent prints."

or touched those items. She testified that the jurors would have deposited their DNA on any items they handled with their bare hands.

With respect to the sexual assault kit, she repeated that even in the absence of seminal fluid, there could be small amounts of male DNA in the form of epithelial cells in the oral and vaginal swabs that could be tested using Y-STR testing, which was not available in 2001. When asked if she was just assuming that male DNA would be present, she replied that, based on the fact that there was forceful penetration, she thought "there is a high reasonable probability that male DNA would be present."

On redirect examination, Ms. Nasir testified that someone's having touched the knife without gloves would "not necessarily" remove the perpetrator's DNA. When asked if she would still expect to find the perpetrator's DNA even if other individuals had since touched the knife, she responded: "I would expect to, because, especially if they brought the knife and it was their knife and they routinely handled it, their DNA would be present in a higher quantity than say, somebody who had just touched it for a few seconds."

At the conclusion of the hearing, the post-conviction court denied the request for DNA testing, finding that the Petitioner had failed to establish that a reasonable probability existed that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis or that DNA analysis available today would resolve an issue that had not been previously resolved. Tenn. Code Ann. § 40-30-304 (1), (3). The post-conviction court noted that the State relied at trial not on DNA evidence but instead on the victim's eyewitness identification of the Petitioner as her attacker along with the testimony of the Petitioner's accomplices.

## ANALYSIS

The Petitioner argues that the post-conviction court erred by not acknowledging or following the standard set forth in *Powers v. State*, 343 S.W.3d 36 (Tenn. 2011) for evaluating whether the Petitioner met the four factors required to access post-conviction DNA testing. The Petitioner asserts that advancements in DNA testing warrant retesting of the tested components of the sexual assault kit and the knife, as well as testing of previously untested components, such as the victim's pubic hair combings and the knife handle. The Petitioner further asserts that, given the prolonged physical attack in a small bathroom, during which the perpetrator moved the victim into different positions, DNA testing is also warranted for the clothing the victim was wearing during the attack and the other items collected from the bathroom that were likely touched by the perpetrator. The State concedes that DNA testing is warranted for the sexual assault kit and the knife, but argues that the other items that could have possibly been touched by the perpetrator "were

- 10 -

all so attenuated from the rape and attempted murder that, even postulating the most realistic favorable results, there is no probability that the [P]etitioner would not have been prosecuted or convicted."

The Petitioner sought DNA analysis of the evidence pursuant to both the mandatory and discretionary portions of the Post-Conviction DNA Act of 2001. The Act provides:

> a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303.

Testing is mandatory when:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id.* at § 40-30-304. Additionally, the court may, in its discretion, order testing when:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id.* at § 40-30-305.

"Under either the mandatory or discretionary provision, all four elements must be met before DNA analysis will be ordered by the court." *Powers*, 343 S.W.3d at 48. A reasonable probability under the statute is a probability sufficient to undermine confidence in the conviction or prosecution. *Id.* at 55. In conducting its analysis of a petitioner's claim, a post-conviction court must presume that the DNA analysis would produce favorable results to the petitioner. *Id.* "While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." *Id.* (citations omitted). The post-conviction court is afforded considerable discretion in its decision whether to grant a petitioner relief under the Post-Conviction DNA Analysis Act, and its judgment will not be reversed unless unsupported by substantial evidence. *See Jones v. State*, No. W2014-02306-CCA-R3-PC, 2015 WL 3882813, at *3 (Tenn. Crim. App. June 24, 2015), *perm app. denied* (Tenn. Sept. 21, 2015) (citation omitted).

At the outset, we observe that the Petitioner has mischaracterized the evidence in identifying what he cites as limitations to the victim's eyewitness identification of him as the perpetrator. Taking snippets of the victim's testimony out of context, the Petitioner cites the fact that the victim was not wearing her eyeglasses, described both intruders as between 5'6" and 5'9" tall in a statement she gave two days after the incident, was able to identify only Jason White at an earlier court hearing, and testified at an earlier hearing that she probably could identify her attacker if she saw him but could not visualize what he looked like at that moment.

- 12 -

At trial, the victim acknowledged that she was not wearing her eyeglasses during the attack but explained that she used her eyeglasses primarily for reading fine print or examining the fine details of an item, such as when she was asked to identify her stolen jewelry during the trial. She acknowledged having said that Jason White was the only one she could identify at an earlier court hearing. However, the Petitioner, who was indicted separately from his accomplices, was not present at that earlier hearing. The victim acknowledged she described the two intruders to law enforcement two days following the attack as both being young and slender and approximately the same height, between 5'6" and 5'9" tall.[4] She explained on cross-examination that she was not in a good condition for a week following the attack and that she was able to recall more and more details as time passed. On direct examination, she testified that there was a lamp that provided adequate light in the bathroom where the attack occurred, and she stated that she was able to study the Petitioner's face when he pulled her off the commode onto the floor:

> At one point, like I said, he was - - jerked me off the cabinet and was getting me around to stretch me out as much as you could in that small bathroom, and that's when I - - I asked him - - because I - - you know, he seemed so young, his hands and everything, and I thought, this is a young person, and here I am an old 70-year-old woman. Why would he want to bother me, you know? And so that was while that he was trying to work with one hand and get my underclothes off, but then he - - when he dropped his- - what he had holding it up, I looked at his face. I studied him. I thought, well that boy is - - he favors my grandson. He's got the same coloring and everything, you know. And they both looked a lot the same size, him and that Jason. They had the - - I guess they - - To me, the make of their body was almost alike, but the color of their hair, he was - - the other boy - - but he didn't try to cover up as much. I saw him several times.

The victim remained steadfast in her identification of the Petitioner as her attacker throughout cross-examination, testifying that although she could not describe the Petitioner at the earlier court hearing, she thought at that earlier hearing that if she could only "lay eyes on him [she] would know because [she] had this image in [her] mind[.]" The victim testified on direct examination that when she saw the Petitioner walk into the courtroom, she immediately recognized him. She did not waver from that statement during cross-examination, testifying that "when [she] saw him, [she] realized that was the one." She volunteered on cross-examination that she might have seen the Petitioner's photograph in the newspaper, but she insisted that she instantly recognized him as her attacker as soon as she saw him in person in the courtroom: " I may have [seen the Petitioner's photograph in the paper], but like I said, soon as I saw him - - I don't remember that I had seen him before,

---

[4] During his trial testimony, the Petitioner stated that he was 6'2" tall.

- 13 -

and - - but when I saw the boy come through the door and everything, I just - - I thought, that's him, that's him."

Aside from our review of the trial transcript, which reveals that the victim was unequivocal in her identification, we note the trial court's comments at sentencing regarding the victim's strong and dignified demeanor at trial. When explaining its rationale for not applying the particularly vulnerable victim enhancement factor, the trial court commended the victim for the way she had conducted herself throughout the proceedings and observed that she had displayed "tremendous dignity" and had done a "good job" in her trial testimony. The trial court also expressed its belief that the victim's survival was due to the victim's "own wits and determination."

Against this backdrop of the victim's obviously powerful trial testimony and eyewitness identification, we turn to an analysis of whether the Petitioner has met the requirements for post-conviction DNA analysis of the sexual assault kit, clothing the victim was wearing at the time of the attack, and assorted towels, washcloths, rugs, and pillowcase collected from the bathroom.

## Sexual Assault Kit

The post-conviction court based its denial of the Petitioner's request for DNA analysis of the sexual assault kit and other items, in large part, on the fact that the State did not rely on DNA evidence at trial. However, "[w]hile courts must . . . consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in the light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." *Powers*, 343 S.W. 3d at 55 (citations omitted). The victim testified that only one of the two intruders she saw in her home raped her, and that it was the same individual who cut her throat. Thus, if the DNA profile of anyone other than the Petitioner is obtained through analysis of the victim's oral and vaginal swabs and pubic hair combings, a reasonable probability exists that the Petitioner would not have been convicted of the rapes and attempted murder.

From the TBI reports attached to the petition, it appears that the victim's panties were collected as part of the sexual assault kit but never tested. Ms. Nasir testified that modern DNA testing methodologies may be able to detect small amounts of semen or sperm cells that would have been missed in 2001. She also testified that it might be possible to obtain a DNA profile from "touch DNA" if the perpetrator touched the victim's clothing. Given the victim's testimony about the attacker's having removed her panties to commit the vaginal rape and that the other intruder never entered the bathroom and did not

- 14 -

participate in the rapes, we conclude that DNA testing is warranted for not only the vaginal and oral swabs and pubic hair combings, but also for the panties.

### Knife

The State agrees with the Petitioner that DNA analysis is warranted for the knife, asserting that "the most realistically possible test results from DNA analysis of the knife would likely be the identification of a single DNA profile other than the victim's, the ability to affirmatively exclude the petitioner from that profile, and the ability to positively identify it as either of the petitioner's codefendants or a known individual." In support, the State cites *State v. Nelson*, No. W2012-00741-CCA-R3-CD, 2014 WL 295833 (Tenn. Crim. App. Jan. 27, 2014), *no perm app. filed*, and *State v. Thomas*, No. E2014-01157-CCA-R3-CD, 2016 WL 7799279 (Tenn. Crim. App. Mar. 28, 2016), *no perm. app. filed*.

The petitioner in *Nelson* was convicted of aggravated rape and other offenses after brandishing a butcher knife to rape and rob the victim. *Nelson*, 2014 WL 295833, at *1. The petitioner's convictions were based on the victim's eyewitness identification and the voice identification by the victim's daughter, who was on the telephone with the victim when the petitioner entered the victim's home. *Id.* The post-conviction court denied the petitioner's request for post-conviction DNA analysis of the butcher knife, finding, among other things, that there was no reasonable probability that the petitioner would not have been prosecuted or convicted if exculpatory results were obtained through DNA analysis. *Id.* at *2-3. The post-conviction court noted that "the type of DNA source" that was the basis for the petitioner's request was "the possibility that skin cells containing the requisite DNA source materials ha[d] been transferred to the knife handle by one holding the knife[,]" and that the record reflected the knife "had been handled, at least intermittently, for the last twenty-three years." *Id.* at *2-3. The post-conviction court, therefore, concluded that even if someone else's DNA was found on the knife, the results would not be exculpatory without any way to ascertain when the DNA was deposited. *Id.* at * 3.

On appeal, this court reversed the decision of the post-conviction court, concluding that it abused its discretion by discounting the opinion of the petitioner's expert witness that the knife was in a sufficiently good condition to permit DNA analysis and by finding that even if DNA from a known sex offender were found on the knife, it would not have meaningfully affected the prosecution or conviction. *Id.* at *6-7. While acknowledging the possibility of cross-contamination during storage or handling or "even more fanciful scenarios" in which a sex offender's DNA could have been deposited on the knife, we found the post-conviction court's logic was "far too thin a reed on which to rest a determination that the most realistically possible favorable test results" would "fail to satisfy the reasonable probability standard." *Id.* at *7.

The defendant in *Thomas* was convicted of first degree premeditated murder based in large part on the testimony of a key witness, Michelle Tolley, that she saw the defendant pull the victim out of the vehicle in which the three had been riding, heard multiple gunshots, and then saw the defendant return to the vehicle without the victim. 2016 WL 7799279, at *5. As in *Nelson*, there was no DNA or fingerprint evidence linking the defendant to the crime. On appeal, this court reversed the trial court's denial of the defendant's request for additional DNA testing of the victim's fingernails and the pants the defendant was reportedly wearing at the time of the offense, concluding that "[s]cientific evidence demonstrating that Tolley was wearing the pants with the victim's blood on them and that Tolley's DNA was underneath the victim's fingernails is sufficient to undermine confidence in the decision to prosecute or the conviction." *Id.* at *22.

In our view, the facts of the instant case are easily distinguishable from those of *Nelson* and *Thomas*. Assuming, *arguendo*, that neither Deputy Ward nor anyone else who may have handled the knife without gloves did not obliterate the perpetrator's DNA, the most realistically favorable results, that Jason White's DNA is on the knife, does not create a reasonable probability that the Petitioner would not have been prosecuted or convicted. The evidence at trial was that Jason White rode in the same vehicle as the Petitioner to the victim's house, entered the victim's house with the Petitioner, searched the victim's bedroom for her jewelry, and was with the Petitioner when the Petitioner took the victim from the den down the hallway to the small bathroom where the rapes occurred. Additionally, White guarded the victim from just outside the small bathroom and rode with the Petitioner, the Petitioner's brother, Taylor, and Smith in the victim's vehicle. Under these facts, there were numerous opportunities for White's DNA to have been deposited on the knife. *See, e.g.*, *State v. Police*, 273 A.3d 211, 300-01 (Conn. 2022) (noting that touch DNA does not necessarily indicate that an individual touched an object, as skin cells can be left behind through primary transfer, secondary transfer, or aerosolization); *State v. Glass*, 279 A.3d 203, 215 (Conn. App. Ct. 2022) (concluding that touch DNA evidence was insufficient to establish guilt absent evidence that it was placed on object by primary and not secondary transfer). Indeed, even if White's DNA were somehow shown to have been directly deposited onto the knife, based on April Kennon's trial testimony, White came into direct contact with the knife when he displayed it to April and Chris Kennon as he gave April Kennon some of the victim's jewelry and told the couple about the crimes. In light of the victim's strong identification testimony and the Petitioner's close proximity to White and his other accomplices, the Petitioner cannot meet the first factor necessary for post-conviction DNA analysis of the knife.

**Victim's Clothing and Assorted items from Bathroom**

As with the knife, we conclude that the Petitioner cannot meet the first factor necessary for post-conviction DNA analysis of the victim's pajamas and robe and the assorted items collected from the bathroom. The victim's son-in-law, law enforcement officers, and paramedics had contact with the victim after the attack, and any one of those men could have left their touch DNA on the victim's clothing. More importantly, the evidence at trial was that White was with the victim in the hallway and in the den and was just outside the victim's small hall bathroom where the assault occurred. We agree with the State that these items were too attenuated from the rapes and attempted murder for even the most realistic favorable results from DNA testing to create a reasonable probability that the Petitioner would not have been prosecuted or convicted or would have received a more favorable verdict or sentence.

## CONCLUSION

Based on our review of the entire record in this case, including the trial transcript, we conclude that the post-conviction court erred in denying the Petitioner's request for DNA testing of the sexual assault kit, including the victim's panties. We further conclude that the Petitioner failed to satisfy the requirements for DNA testing of the additional items of evidence, including the knife. Accordingly, the judgment of the post-conviction court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

_____
JOHN W. CAMPBELL, SR., JUDGE